UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | Case Nos. 00-10361 (ALG) |
| DAYTON SEASIDE ASSOCIATES #2, L.P., | : | 00-10363 (ALG) |
| DAYTON SEASIDE ASSOCIATES #3, L.P. | : | and 00-10364 (ALG) |
| and DAYTONE OPERATING COMPANY, | : | |
| L.P., | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |

———————————————————————————x

> THIS IS NOT A SOLICITATION OF ACCEPTANCES OR
> REJECTIONS OF THE PLAN.  ACCEPTANCES OR REJECTIONS
> MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT
> HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS
> DISCLOSURE STATEMENT IS BEING SUBMITTED FOR
> APPROVAL, BUT HAS NOT BEEN APPROVED BY THE
> BANKRUPTCY COURT.

**SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION OF DAYTON SEASIDE ASSOCIATES #2, L.P., DAYTON SEASIDE ASSOCIATES #3, L.P., AND DAYTON OPERATING COMPANY, L.P. FILED JOINTLY BY THE DEBTORS AND METROVEST CAPITAL CORP.**

Thomas R. Califano
MORRISON COHEN SINGER &
WEINSTEIN, LLP
Attorneys for Metrovest Capital Corp
750 Lexington Avenue
New York, New York 10022
(212) 735-8759

Robert R. Leinwand
Fred B. Ringel
ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.
Attorneys for the Debtors
1345 Avenue of the Americas
New York, New York 10105-0143
(212) 586-4050

Dated: New York, New York
        October 24, 2001

## SUMMARY

Dayton Seaside Associates #2, L.P.,  Dayton Seaside Associates #3, L.P., and  Dayton Operating Company, L.P.( collectively, the "Debtors"), jointly with Metrovest Capital Corp. ("Metrovest") have filed the  *Second  Amended Plan of Reorganization of Dayton Seaside Associates #2, L.P., Dayton Seaside Associates #3, L.P.,  and  Dayton Operating Company, L.P. filed jointly  by the Debtors and Metrovest Capital Corp.* dated  October 24, 2001 (the "Plan"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  This *Disclosure Statement for* the *Plan of Reorganization of Dayton Seaside Associates #2, L.P., Dayton Seaside Associates #3, L.P.,  and  Dayton Operating Company, L.P. filed jointly  by the Debtors and Metrovest Capital Corp.* (the "Disclosure Statement") has received the approval of the Bankruptcy Court for use in connection with the solicitation of acceptances of the Plan from holders of Claims against and Interests in the Debtors pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code").

A copy of the Plan accompanies this Disclosure Statement.  A glossary of terms frequently used in this Disclosure Statement is set forth in Article 1 of the Plan.

In the Debtors' and Metrovest's opinion, the treatment of Claims and Interests under the Plan provides a greater recovery for Creditors and Interest Holders than that which would be likely to be achieved under other alternatives for the reorganization or liquidation of the Debtors.

**Accordingly, the Debtors and Metrovest believe that Confirmation of the Plan is in the best interests of Creditors and Interest Holders and recommends that you vote to accept the Plan.**

## THE PLAN

The Plan provides for the reorganization of the Debtors' businesses through the mechanism of a sale of its properties to a Successor Entity or Entities[1] controlled by Metrovest and the payment, from the Plan Fund provided by Metrovest, of distributions in accordance with the priorities established by the Bankruptcy Code.  Under the terms of the Plan, the Debtors shall make payment of allowed secured claims in accordance with either (i) agreements made between the parties (as is the case with Metrovest and Zukerman Bros.) or (ii) payment in cash in full on the Effective Date. Unsecured Creditors will receive, on the Effective Date, the lesser of payment in full in Cash

---

[1] Capitalized terms in this Disclosure Statement have the same meaning as set forth in the Plan, unless specifically noted to the contrary.

plus interest at the rate of 6.50% or a *pro*-rata share of $135,000, if the total of Allowed Unsecured Claims exceed $135,000.

Holders of insured claims will be required to look to insurance proceeds, if any, for their recovery on Insured Claims. Holders of limited partnership interests in the Debtors will be given a one-time right to retain their interests in the property by acquiring new limited partnership interests in the Successor Entity. To acquire such interests, such electing limited partnership unit holders will be required to pay, at the time they cast their Ballot, their *pro rata* share of the Cash component of the Plan Funds and agree to personally guaranty their *pro rata* share of the debt incurred by the Successor Entity necessary to establish the Plan Fund and make the Repairs. The holders of general partnership interests will have such interests extinguished on the Effective Date.

The table below provides a summary of the classification and treatment of Claims and Interests under the Plan. The figures set forth in the table below represent the Debtors' best estimate of the total amount of Allowed Claims and Allowed Interests in the Case. These estimates have been developed by the Debtors based on an analysis of the Schedules filed by the Debtors, the Proofs of Claims and Proofs of Interests filed by Creditors and Interest Holders, and certain other documents of public record. The Bankruptcy Court set June 13, 2001 as the final date for filing Proofs of Claims and Proofs of Interests by Creditors and Interest Holders. See "SIGNIFICANT EVENTS IN THE CASE -- Bar Date." There can be no assurance that Claims and Interests will be allowed by the Bankruptcy Court in the amounts set forth below:

| Class and Estimated Amount[2] | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| Not Applicable Approximately $600,000 | Administrative Claims (including Claims for Professional Compensation and Reimbursement, Post-petition Ordinary Course Liabilities and Post-petition Tax Claims. | **Unimpaired.** Each Administrative Claim, to the extent not previously paid, shall be paid by the Disbursing Agent in Cash in full from the Plan Fund on (i) the later of the Effective Date, the date payment of such Claim is due under the terms thereof or applicable law, or three business days after such Claim becomes an Administrative Claim or (ii) as may be otherwise mutually agreed in writing between the Disbursing Agent and the holder of such Claim; *provided, however,* that any |

---

[2]     The amounts set forth in this schedule are not, and should not be deemed to deemed admissions by the Debtors as to the validity or amount of any claim.

| Class and Estimated Amount[2] | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| | | Administrative Claim incurred by the Debtor in the ordinary course of its business shall be paid in full or performed by the Reorganized Debtor in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto. |
| Class 1 $ 1,000 | Priority Claims (other than Administrative Claims) | **Unimpaired.** Subject to the provisions of article 8 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of the Priority Claims, the holders of Priority Claims shall receive in Cash, in the full amount of its Priority Claim to be paid by the Disbursing Agent from the Plan Fund. |
| Class 2 $ 6,061,788.00 | Metrovest Secured Claim | **Impaired**. In full satisfaction of the Metrovest Secured Claim, Metrovest shall receive the consideration provided for under the Plan Funding Agreement and the Metrovest Secured Claim shall be deemed satisfied and discharged on the Effective Date. *See*, Page 26 |
| Class 2A $1,740,000 | Washington Mutual Secured Claim | **Unimpaired.** In full satisfaction of the Washington Mutual Secured Claim, on the Effective Date, Washington Mutual will receive payment in full, in Cash, of its Allowed Secured Claim to be paid from the Plan Fund. |
| Class 3 $ 18,284,299 | Wrap Mortgage Secured Claim | **Impaired.** In full satisfaction of the Wrap Mortgage Secured Claims, on the Effective Date, Zukerman Bros. shall receive the consideration provided for in the Plan Funding Agreement (as is further described on pages 25 and 29 hereof). |

| Class and Estimated Amount[2] | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| Class 4 $64,062,090.13[3] | City Claims | **Impaired.** In full satisfaction of the City Claims, on the Effective Date, the City shall receive (i) the sum of $10,000,000 in Cash to be paid from the Plan Fund, in full satisfaction of all City Claims against the Debtors and/or the Dayton Operating Property, the Dayton 2 Property and the Dayton 3 Property (ii) the Successor Entity shall agree to limit the otherwise available MCI Rent Increases as they pertain to the Repairs to be performed under the Plan applicable to apartments at the Properties by electing to receive increases at 10.58% to be phased in over a two year period as follows: (1) 6% on the first anniversary of the Effective Date and (2) 4.58% on the second anniversary of the Effective Date. In addition, Metrovest will be entitled to a J-51 Tax Abatement in the amount of $74,668 per year for the twenty (20) years commencing with the first anniversary of the Effective Date. Metrovest will complete the Repairs in compliance with the schedule annexed to the Plan as Exhibit "A." With respect to any claims of the City of New York relating to unpaid real estate taxes with respect to the Parking Lot at the election of the Successor Entity, either (i) such claims shall be satisfied by the Successor Entity or (ii) the Parking Lot shall be abandoned by the Reorganized Debtor. |
| Class 5 $133,323 (as set forth in schedules) | Unsecured Claims | **Impaired.** Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, and subject to a cap of $135,000, on the Effective Date, each holder of an Unsecured Claim shall receive payment in Cash equal to one hundred (100%) percent of the Allowed amount of such |

[3] Foregoing is amount set forth in proof of claims filed in this case and is the subject of an ongoing dispute and objection by the Debtors.

| Class and Estimated Amount[2] | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| | | Class 5 Claim, plus interest thereon at the rate of six and one-half (6.50%) percent from the Petition Date, to be paid by the Disbursing Agent from the Plan Fund. To the extent Allowed Unsecured Claims exceed $135,000, then the holder of each Class 5 Claim shall be paid its pro-rata share of $135,000 in full satisfaction of such Allowed Class 5 Claim. |
| Class 6 $ unknown[4] | Insured Claims | **Impaired.** The holders of Allowed Class 6 Claims shall retain their claims against the Debtors solely to the extent of applicable insurance coverage |
| Class 7 inapplicable | Allowed Limited Partnership Interests | **Impaired.** Prior to the Confirmation Hearing in the manner set forth herein, all holders of Allowed Limited Partnership Interests shall have a one time opportunity to elect to retain such interests in the Successor Entity, as defined in the Plan Funding Agreement, in exchange for (i) a contribution of Cash equal to such Limited Partner's Pro-Rata share of the cash component of the Plan Funding Amount plus (ii) such Limited Partners unconditional personal guaranty of their Pro-Rata share of any monies borrowed by the Successor Entity to fund the Plan Funding Agreement and funds required to complete the renovations set forth in Exhibit "A" hereto. Any Limited Partner which does not contribute and guaranty the amounts required to fund the Plan Funding Amount and otherwise complete the obligations required under this Plan shall have their interest cancelled as of the Effective Date. Any election made under this section of the Plan must be made on the Class 7 Interest |

---

[4] Approximately $20,000,000 in face value of claims each have been filed with the Court seeking damages related to alleged tort claims for which the Debtors have insurance available.

| Class and Estimated Amount[2] | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| | | Holders ballot accepting or rejecting the Plan and the Cash component must accompany any ballot accepting the Plan in the form of certified funds in order for the holder of such Allowed Interest to retain such interest after the Effective Date. All ballots which purport to accept the Plan and are not accompanied by the Cash component and a duly executed personal guaranty shall result in such interest holder's interest in the Debtors being terminated on the Effective Date. The Cash component tendered hereunder shall be held by counsel to the Debtors in an interest bearing escrow account until the Effective Date. |
| Class 8 Inapplicable | Allowed General Partnership Interests | **Impaired**. On the Effective Date, all Allowed General Partnership Interests in the Debtors shall be deemed cancelled. |

CONFIRMATION OF THE PLAN

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan, on _____, 2001 at __:__ _.m, Eastern Standard Time, in the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, Fifth Floor, New York, New York 10004. The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be filed and served on or before _____, 2001, in the manner described under ACCEPTANCE AND CONFIRMATION -- Confirmation Hearing."

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. The Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing. In the event that any impaired Class of Claims does not accept the Plan, the Debtors may seek a "cramdown" Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. **The Debtors and Metrovest believe that the Plan satisfies all applicable requirements of section 1129(a) and section 1129(b) of the Bankruptcy Code**. See "ACCEPTANCE AND CONFIRMATION -- Requirements for Confirmation" for a description of

such requirements.  Confirmation makes the Plan binding upon the Debtors, its Interest Holders, all Creditors and other parties regardless of whether they have accepted the Plan.

**VOTING INSTRUCTION SUMMARY**

The following discussion summarizes more detailed voting instructions set forth in the section of this Disclosure Statement entitled "VOTING INSTRUCTIONS."  If you have any questions regarding the timing or manner of casting your ballot, please refer to the "VOTING INSTRUCTIONS" section of this Disclosure Statement and the instructions contained on the ballot that you received with this Disclosure Statement.

**General**.  The Debtors have sent to all of its known Creditors and Interest Holders, who are in Classes impaired under the Plan a ballot with voting instructions and a copy of this Disclosure Statement.  Creditors may refer to the above chart to determine whether they are impaired and entitled to vote on the Plan.  Creditors and Interest Holders should read the ballot carefully and follow the voting instructions.  Creditors and Interest Holders should only use the official ballot that accompanies this Disclosure Statement.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by (a) the holders of two-thirds in amount and more than one-half in number of claims in each class who actually vote on the Plan, and (b) the holders of two-thirds in amount of equity security interests in each class of interests who actually vote on the Plan.  In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if (i) the Bankruptcy Court finds that the Plan accords fair and equitable treatment, and does not discriminate unfairly, with respect to the class rejecting it and (ii) at least one impaired class has accepted the Plan determined without considering the acceptance of any insider.  See "ACCEPTANCE AND CONFIRMATION -- Requirements for Confirmation" and EFFECT OF CONFIRMATION."

**As the preceding paragraph makes evident, a successful reorganization depends upon the receipt of a sufficient number of votes in support of the Plan.  YOUR VOTE IS THEREFORE EXTREMELY IMPORTANT.  Creditors and Interest Holders should exercise their right to vote to accept or reject the Plan.**

**Voting Multiple Claims and Interests-Multiple Claims held against Multiple Entities**.  A single form of ballot is provided for each Class of Claims or Interests in each of the respective Debtors.  Any Person who holds Claims or Interests in more than one Class is required to vote separately with respect to each Class in which such Person holds Claims or Interests. Any Person who holds claims against more than one of the Debtors is required to vote separately with respect to each such Debtor entity.  However, any Person who holds more than one Claim or Interest in one particular Class against one particular Debtor will be deemed to hold only a single Claim or Interest in

such Class in the aggregate amount of all Allowed Claims or Allowed Interests in such Class held by such Person. Thus each Person need complete only one ballot for each Class of claims it holds against any particular Debtor entity.

**Deadline for Returning Ballots**. The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by the Debtors, no later than 5:00 p.m., Eastern Standard Time, on _____, 2001, at the following address:

> Robinson Brog Leinwand Greene Genovese & Gluck P.C.
> 1345 Avenue of the Americas
> 31st Floor
> New York, New York 10105
> Attn: Dayton Ballots.

**Voting Questions**. If you have any questions regarding the provisions or requirements for voting to accept the Plan or require assistance in completing your ballot, you may contact Debtors' counsel at (212) 586-4050.

**Election of Limited Partners**. Under the Plan, holders of limited partnership interests in any of the Debtors have a one-time right to retain their respective interests in the Debtors which they owned prior to the commencement of this Debtors' chapter 11 cases, which interests will consist of interests in the Successor Entity. More specifically, each limited partnership unit (representing 1% of the outstanding interests) in each Debtor shall entitle the holder thereof to purchase 1/3 of a limited partnership unit (representing 1/3 of 1% of the outstanding interests) in the Successor Entity. Holders of Limited Partnership interests may exercise this right by making certain *pro rata* cash contributions <u>and</u> executing personal guarantees of bank debt incurred to finance the Plan Fund at the time they cast their ballots to accept or reject the Plan. To make an effective election to continue their equity interests in the Successor Entity and become an "electing limited partner", the holder of a Limited Partnership equity interest in any of the Debtors must return the following items along with their ballots voting on the Plan:

1.      A certified or bank check made payable to "Robinson Brog Leinwand Greene Genovese & Gluck P.C. as attorneys" equal to their *pro rata* share of the cash component of the Plan Fund of $9,492,988. Each limited partnership unit (representing 1% of the outstanding interests) in each Debtor shall entitle the holder thereof to purchase 1/3 of a limited partnership unit (representing 1/3 of 1% of the outstanding interests) in the Successor Entity. For example, a holder of 3 limited partnership units in any of the Debtors shall be entitled to obtain one limited partnership unit in the Successor Entity. Accordingly, the *pro rata* share shall be $31,643.29 per each unit of limited

partnership interest in any of the Debtors. Holders of multiple units must submit the applicable amount multiplied by the numbers of units held.

2. In addition to the pro-rata cash contribution set forth above, each electing Limited Partner must submit a notarized original of a personal guaranty on the form annexed hereto as Exhibit "B." Such guaranty will personally obligate the limited partner with respect to the non-cash component (*i.e.*, monies borrowed from Roslyn Savings Bank ) to fund all payments required under the Plan Funding Agreement. If the total limited partners election exceeds 10% of the total limited partner interests in the Successor Entity, Metrovest shall have the right to terminate the Plan Funding Agreement in accordance with Article 9 thereof.

**ANY LIMITED PARTNER WHO VOTES EITHER TO ACCEPT OR REJECT THE PLAN BUT DOES NOT INCLUDE HIS/HER GUARANTY AND *PRO RATA* CASH CONTRIBUTION WITH THE BALLOT SHALL HAVE THEIR LIMITED PARTNERSHIP INTEREST TERMINATED ON THE EFFECTIVE DATE AND SHALL NO LONGER BE CONSIDERED A LIMITED PARTNER IN THE DEBTORS OR ANY SUCCESSOR ENTITY FOR ANY PURPOSE WHATSOEVER.**

**NOTICE TO HOLDERS OF CLAIMS AND INTERESTS**

This Disclosure Statement and the accompanying ballots are being furnished by the Debtors to the Debtors' known Creditors and Interest Holders pursuant to section 1125(b) of the Bankruptcy Code in connection with a solicitation of acceptances of the Debtors' chapter 11 plan for each of the Debtors. A copy of the Plan is included in this package and is incorporated herein by reference.

The purpose of this Disclosure Statement is to enable you, as a Creditor whose Claim is in a Class impaired under the Plan or as an Interest Holder whose Interest is in a Class impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN PROPOSED BY THE DEBTORS AND METROVEST. PLEASE READ THIS DOCUMENT WITH CARE.**

**THIS DISCLOSURE STATEMENT IS NOT A SOLICITATION FOR CAPITAL CONTRIBUTIONS TO THE DEBTORS FROM ANY ENTITY.**

**THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY ANY BANKRUPTCY COURT, THE SECURITIES AND EXCHANGE COMMISSION OR ANY**

**STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE FAIRNESS OR MERITS OF THE PLAN OR UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

The historical information concerning the Debtors has been prepared using the Debtors' books and records and certain filings made with the Bankruptcy Court.  The estimates of Claims and Interests set forth herein may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court.  While every effort has been made to ensure the accuracy of all such information, except as noted in the Disclosure Statement, the information presented herein is unaudited and has not been examined, reviewed or compiled by the Debtors' independent public accountants.

The Projections if any, which are contained in the Disclosure Statement, are a presentation of possible future events based on certain assumptions regarding the operations of the Debtors.  The Projections were not prepared with a view toward public disclosure or compliance with the guidelines established by the Securities and Exchange Commission and were not prepared with a view towards compliance in all instances with the guidelines established by the American Institute of Certified Public Accountants regarding financial forecasts.  The Projections have not been prepared in accordance with generally accepted accounting principles in all instances.  Further, such projections have not been examined, reviewed or compiled by the Debtors' independent public accountants.  See "FINANCIAL PROJECTIONS -- Projections."

While presented with numerical specificity, the Projections are based upon a variety of assumptions which, although the Debtors believe are reasonable, may not be realized, and are subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors.  Consequently, the inclusion of the Projections herein should not be regarded as a representation by the Debtors (or any other person) that the Projections will be realized, and actual results may vary materially from those presented below.  Due to the fact that such Projections are subject to significant uncertainty and are based upon assumptions which may not prove to be correct, neither the Debtors nor any other person assumes any responsibility for their accuracy or completeness.

This Disclosure Statement contains a summary of certain provisions of the Plan and the transactions contemplated thereunder, as well as descriptions of certain other related documents. While the Debtors believe that these summaries are fair and accurate, such summaries are qualified to the extent that they do not set forth the entire text of such documents.  Reference is made to the Plan and the documents referred to herein and therein for a complete statement of the terms and provisions thereof.  In the event of any inconsistency between the terms of the Plan and this Disclosure

Statement, the terms of the Plan shall be controlling.  In reviewing the Plan and this Disclosure Statement, the reader should give special attention to "RISK FACTORS."  No statements or information concerning the Debtors or their assets, results of business operations or financial condition or the securities to be issued pursuant to the Plan, are authorized by the Debtors other than as set forth in this Disclosure Statement and the exhibits hereto (including the Plan).

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein.  The delivery of this Disclosure Statement shall not create, under any circumstances, an implication that there has been no change in the facts set forth herein since the date hereof.

This Disclosure Statement is intended for the sole use of Creditors and Interest Holders to make an informed decision about the Plan.  Each holder of a Claim or Interest should review this Disclosure Statement and all exhibits hereto (including the Plan) before casting a ballot.  Holders of Claims or Interests are urged to consult with their own legal and financial advisors.

No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  No Person has been authorized to use or promulgate any information concerning the Debtors or their businesses or the Plan, other than the information contained in this Disclosure Statement and the exhibits hereto.  You should not rely on any information relating to the Debtors or their businesses or the Plan other than that contained in this Disclosure Statement and the exhibits hereto.

### PROPONENT'S RECOMMENDATION

In the Debtors' and Metrovest's opinion, the treatment of Creditors and Interest Holders under the Plan provides a greater recovery than is likely to be achieved under any other alternatives, including liquidation under Chapter 7.  See "ALTERNATIVES TO THE PLAN."  In particular, the Debtors believe that in a chapter 7 liquidation administrative costs will be greater, substantial delays would be encountered by virtue of litigation with the City which is resolved under the Plan and it is unlikely that unsecured creditors would receive any more on account of their Claims than is provided under the Plan.

**THE DEBTORS AND METROVEST BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND INTEREST HOLDERS, AND URGES EACH CREDITOR AND INTEREST HOLDER ENTITLED TO VOTE TO ACCEPT THE PLAN.**

**THE DEBTORS**

      The Debtors are limited partnerships maintaining an office for the conduct of their business at c/o Martin Zukerman, 225 E. 57th Street, New York, New York.

      The Debtors' principal assets consists of, with respect to Dayton Operating Company L.P., the apartment building located at 107-10 Shore Front Parkway, Rockaway Park, New York, with respect to Dayton Seaside Associates #2 L.P., the apartment building located at 106-20 Shore Front Parkway, Rockaway Park, New York, and with respect to Dayton Seaside Associates #3 L.P., the apartment building located at 1 Beach 105th Street, Rockaway Park, New York.

**THE CITY CLAIMS**

      The following summary of the City of New York's claims and the various parties' assertions are the Debtors' contentions of fact and law. Many, if not all of such contentions are disputed by the City of New York and are the subject of pending litigation which will be resolved if the Debtors' Plan of Reorganization is confirmed by the Court.

      In the Debtors' view, one of the principal reasons for the commencement of these chapter 11 cases was a longstanding dispute with the City of New York over the real estate taxes which allegedly were due and payable with respect to the Debtors' properties. By the Petition Date, the City was claiming that over $64,000,000 in back taxes were due and owing it while the Debtors' contended that they were owed a refund and the City had woefully miscalculated the taxes due and owing in breach of various agreements between the parties. Immediately before the commencement of these cases, the City had commenced a tax foreclosure and sought the appointment of a receiver. These cases were instituted, in part, to avoid a loss of control of the properties and to provide a forum for the resolution of the dispute between the Debtors and the City.

*Background*

      The Debtors each own a high-rise apartment building located in Rockaway Park, New York. Each is a "redevelopment company" formed under New York's Private Housing Finance Law (the "PHFL"). Their apartment buildings were constructed pursuant to Article V of the PHFL, a statute enacted in recognition of the need of upgrading available living accommodation for low and moderate income families. To effectuate this policy, the State of New York encourages local and municipal governments to waive or limit their real estate taxes on redevelopment projects for the purpose of stimulating the growth and development of such projects. Implementing the PHFL, the City entered into written agreements which, among other things, the Debtors believed, assured the Debtors that

the rents and taxes on the properties would be regulated by the City so as to provide them with a six-percent return on the cost of constructing their buildings.

As a result of their status as redevelopment companies, the Debtors are entitled to real property tax exemptions under two separate statutes, Section 125 of New York's PHFL and Section 423 of New York's Real Property Tax Law ("RPTL"), and by written agreement with the City implementing these statutes. These tax exemptions are part of a statutory framework intended to induce the construction of low and moderate income housing, and also to assure a six-percent return on the costs of such construction, pursuant to Section 107 of the PHFL. Section 125 of the PHFL authorizes municipalities to grant partial relief to any redevelopment company for an initial 25-year period, pursuant to a written agreement; if the redevelopment company has permanent federal-financing, however, the tax relief lasts for either the life of that financing or forty years, whichever is shorter. Section 423 of the RPTL provides for a nine year phase-in to full tax status once the tax benefits under Section 125 of the PHFL expire.

*The Original Agreement*

The Debtors' predecessor, Dayton Seaside Corp., was formed as a redevelopment company pursuant to what was then known as the Redevelopment Companies Law. The law was created to improve the quality of rental housing in New York City, particularly for moderate income tenants and elderly tenants. Pursuant to Section 8 of the former Redevelopment Companies Law and Section 107 of the PHFL, the owner of the project was and is entitled to an annual return on its investment of six percent of the total actual final cost of the project.

Pursuant to Section 26 of the former Redevelopment Companies Law, the local legislative body, which at the time was the New York City Board of Estimate, had the authority to contract with a redevelopment company to exempt a project from real estate taxes in accordance with a statutory formula. At that time, the period of such exemption was 25 years from the date the benefits of the exemption first became effective.

In this case, the Debtors' predecessor entered into an agreement with the City of New York (the "Original Agreement") on October 8, 1959, providing for a partial tax exemption to run for twenty-five years. The Original Agreement is annexed as Exhibit C. The pertinent portion of the Original Agreement, Section 407, provided for a forty–percent tax exemption for twenty five years:

> Pursuant to Section 26 of the Redevelopment Companies Law [now N.Y.P.H.F.L. § 125], the City, acting by its Board of Estimate agrees to, and hereby does exempt from local and municipal taxes, other than assessments for local improvements for the period of twenty-five years

commencing with the date on which the benefits of such tax exemption first become available and effective, forty (40%) percent of the value of the property included in such project which represents an increase over the assessed valuation of the real property, both land and improvements acquired for the project at the time of its acquisition by the redevelopment company which originally undertook the project.

Upon the expiration of twenty-five (25) years, commencing on the date on which the benefits of such exemption first became available and effective, all tax exemption of the Project shall cease and terminate. (emphasis added)

In addition, Section 407 provided the following starting point for the twenty-five year tax reduction:

The date on which the benefits of such exemption for the project shall first become available and effective shall be the date of actual completion of such project, except that if the project be undertaken or completed in stages, then in case any building constituting part of the project shall be so completed or occupied prior to the date of completion of the project, the benefits of such exemption for that particular building and the land on which it is located shall become available and effective on the date as of which it would otherwise have become so subjected to taxation in excess of the exemption herein granted. (emphasis added)

For Dayton Seaside Associates No. 2, the stated term thus ran from 1964 through 1989; for Dayton Seaside Associates No. 3, from 1967 to 1992; for Dayton Operating Company, from 1963 through 1988. In 1969, Section 125 of the PHFL was amended to extend this 25 year term to forty years for federally financial projects.

In Section 408 of the Original Agreement, the City committed to assuring Debtors a six-percent return on the cost of completing the buildings, inter alia, by increasing rents to the extent necessary to generate such a return. Section 408 provides in pertinent part:

The Housing Company agrees that during the period of tax exemption provided in Paragraph 407 of this Article, it will not charge rentals for residential apartments in buildings constructed on the Site comprising the Project at rates in the aggregate exceeding a maximum average rental of $25.00 in the case of a cooperative and $32.00 in the case of

a straight rental per month per rental room; provided, however, that if the revenue derived from such rental together with all other revenues received by the Housing Company (including any Cash Surplus) should be insufficient to pay expenses, taxes and assessment of the Project and to provide an aggregate sum for interest, amortization, depreciation to the extent, if any, that it exceeds amortization and dividends equal to but not exceeding six per centum (6%) per annum of the total actual final cost of the Project (said expenses, taxes and assessments and said aggregate sum being for convenience hereafter in this Paragraph 408 collectively referred to as the "Cash Requirements of the Project") then the Housing Company (or the Federal Housing Commissioner, or his successor in office, in the event that the Project is then owned by him) may make application to the Board of Estimate of the City for permission to increase the maximum average rental per month per rental room and give evidence to said Board of Estimate that, after the application of any Cash Surplus under the existing rentals it is not possible to pay annually out of the revenue derived from such rentals together with all other revenue the Cash Requirements of the Project. If upon public hearing duly had, such facts shall be established by a preponderance of the credible evidence, the Board of Estimate shall grant the application to increase the maximum average rental per month per room by an amount to provide annually thereafter sums sufficient to pay the Cash Requirements of the Project and to provide for the liquidation, within a reasonable period of time, of any Cash Requirements of the Project theretofore accumulated and unpaid. If after such hearing the Board of Estimate refuses to grant the application as and to the extent requested, then the applicant shall have the right, in addition to any other right or remedy available to it, to cause the action of the Board of Estimate to be reviewed by instituting an appropriate proceeding under Article 78 of the Civil Practice Act (or under other suitable provisions of law which may supersede Article 78) for such purpose.

Section 408 of the Original Agreement thus provided that the Debtors would be entitled to rent increases, if the rent level was not sufficient to meet the expenses of the project, including taxes, in order to provide the Debtors with their statutorily mandated six-percent return on investment. In other words, the Original Agreement contemplates that the City will regulate rental charges in the buildings, both to assure payment of taxes and the owners' six-percent return.

Because the project was built under a program addressed to low and moderate income housing needs, rents were fixed at a modest level when the buildings were first occupied.

*The 1968 Amendment*

The initial tax exemption was insufficient to conform the properties expenses with their modest rent charges. Instead of raising rents, the Board of Estimate temporarily increased tax exemptions through an amendment to the Original Agreement, dated May 14, 1968 (the "1968 Amendment"). Under the 1968 Amendment, the Debtors were granted a sliding scale partial tax exemption ("Sliding Scale Exemption"), with increased exemptions (more than 40%) immediately and reduced exemptions (less than 40%) in later years. The pertinent portion of the 1968 Amendment provides:

> Paragraph 407 of the Agreement [the Original Agreement] is hereby modified to provide each of the Housing Companies, subject to the terms of the Agreement, with an exemption from local and municipal taxes, other than assessments for local improvements, in the amounts and for the period hereinafter stated, to be applied against the value of the property included in the project, which represents an increase over the assessed valuation of the real property, both land and improvements acquired for the project at the time of its acquisition by Dayton Seaside Corp.:
> \* \* \*

### DAYTON SEASIDE CORP.

| | | | |
|---|---|---|---|
| 1968-1972 | (5 years) | - | 70% |
| 1973-1977 | (5 years) | - | 55% |
| 1978-1982 | (5 years) | - | 25% |
| 1983-1987 | (5 years) | - | 10% |

### DAYTON SEASIDE NO. 2 CORP.

| | | | |
|---|---|---|---|
| 1968-1972 | (5 years) | - | 70% |
| 1973-1977 | (5 years) | - | 55% |
| 1978 | (1 year) | - | 40% |
| 1979-1983 | (5 years) | - | 25% |
| 1984-1988 | (5 years) | - | 10% |

### DAYTON SEASIDE NO. 3 CORP.

| | | | |
|---|---|---|---|
| 1968-1972 | (5 years) | - | 70% |
| 1973-1977 | (5 years) | - | 55% |
| 1978-1981 | (4 years) | - | 40% |
| 1982-1986 | (5 years) | - | 25% |
| 1987-1991 | (5 years) | - | 10% |

By reducing taxes through the Sliding Scale Exemption, the City used its ability to regulate taxes as an alternative to increasing rents, to assure Debtors' their six-percent return. The Sliding Scale Exemption, however, was used for only two years. The City soon recognized that its implementation would result in undesirable rent increases. As of July 1, 1970, tax exemptions based on the "shelter rent formula" in Section 33 of New York's PHFL were implemented. These exemptions established taxes at levels far below the Sliding Scale Exemption.

*The Shelter Rent Exemption and Extensions*

On April 22, 1971, the Board of Estimate adopted its first resolution granting the Debtors' tax exemptions based on the shelter rent formula in Section 33 of New York's PHFL (the "Shelter Rent Exemption"). The Shelter Rent Exemption authorizes a "local legislative body" to permit the taxpayer to pay 10% of total rents collected, less the cost of fuel and utilities, in lieu of real property tax. The first Shelter Rent Exemption was granted retroactive to July 1, 1970 for a three-year period ending June 30, 1973. The Board of Estimate at the same time granted increases in rents.

In or about 1974, the Debtors applied for another extension of the Shelter Rent Exemption and a rent increase. On April 4, 1974, the Board of Estimate granted the rent increase and extended the Shelter Rent Exemption for four years, retroactive to July 1, 1973 until June 30, 1977.

On January 10, 1980, the City granted another rent increase and reinstated the Shelter Rent Exemption retroactive to July 1, 1976 (even though it would not expire until July 1, 1977) to remain in effect through December 31, 1984. The actions of the City reflect the letter and spirit of Sections 407 and 408 of the Original Agreement and Sections 107 and 125 of the PHFL – namely that rents and taxes would be regulated so as to provide the building owners with a six-percent return.

*The 1980 Amendment*

On or about January 10, 1980, the Debtors through their predecessors, entered into an Amendatory Agreement with the City of New York (the "1980 Amendment"), further amending the Original Agreement. In the 1980 Amendment, the City consented to the transfer of ownership of the properties from the Debtors' predecessors to the Debtors. In addition, the 1980 Amendment set forth the formula for calculating the six-percent return on equity for the Debtors' properties that would

govern for the remainder of their 25 year abatement period. As part of this formula, it authorized the Debtors to pay to their investors, the "unpaid cash requirements" of the buildings, representing the six-percent return that had accumulated but not yet been paid. The 1980 Amendment thus re-confirmed each Debtor's right to a six-percent profit. The 1980 Amendment also "reinstated retroactively to July 1, 1976" the Shelter Rent Exemption and further provided that the Shelter Rent Exemption would "remain in effect through December 31, 1984."

In the 1980 Amendment, The City, through the Board of Estimate, also consented to rent increases for all three buildings, accompanied by the requirement that any tenant be permitted to terminate his or her lease upon 30 days written notice after the implementation of the rent increase.

*The 1982 Amendment*

On November 18, 1982, the Debtors entered into another Amendatory Agreement with the City of New York (the "1982 Amendment").

The 1982 Amendment relieved the Board of Estimate of the burden of establishing rents and instead required the Debtors to enroll in the Rent Stabilization program. As part of this change, the 1982 Amendment further provided that the City would enter into a "transition" agreement in connection with the shift to rent stabilization. Section 8 of the Amendment provides as follows:

> Since it is desired by the owners of the Development Companies to enroll in the Rent Stabilization Association and to subject all units in the Development Companies to rent stabilization, and since such units would be subject to rent regulation under the Emergency Tenant Protection Act of 1974 and under the New York City Rent Stabilization Law, but for the exercise of rent regulatory jurisdiction by the Board of Estimate pursuant to Article V of the Private Housing Finance Law, and since the Board of Estimate agreed to release its rent regulatory jurisdiction pursuant to the resolution adopted November 18, 1982 (Cal. No. 22) it is agreed that the Development Companies may apply, in accordance with applicable law and upon notice to the Project's Tenant Association, for the enrollment of all the Development Companies in the Rent Stabilization Association and it is further agreed that upon the effective application of the Rent Stabilization Law to all residential units within the Housing Project, <u>the Board of Estimate shall no longer set rents for the Development Companies and that the Commissioner of the</u>

<u>Department of Housing Preservation and Development will enter into</u> <u>an appropriate agreement to effect such transition with the</u> <u>Development Companies</u>. (emph. added)

A "transition" agreement was necessary because once the Shelter Rent Exemption expired under the 1982 Amendment at the end of 1984, the Debtors would have no tax exemptions, other than the 1968 Amendment's Sliding Scale Exemption, which the City had not used for 14 years. Under the 1982 Amendment, the Debtors' rents were thereafter to become established by the Rent Stabilization Law, which limited the Debtors from raising rents <u>pari passu</u> with tax increases. A "transition" agreement was therefore necessary to reconcile the Debtors' tax burdens with the City's contractual assurance of a six-percent return. Absent such a transition, the Debtors' ownership interest in their property would be rendered worthless since, under Rent Stabilization, they would lose the ability to adjust rents immediately to correspond to higher taxes, as permitted by Section 408 of the Original Agreement.

In or about November 1982, the Debtors enrolled in the Rent Stabilization program. Their tenants' rents then became established by the Rent Stabilization Law, rather than the Board of Estimate. The City, however, has never entered into "an appropriate agreement to effect such transition," as required by Section 8 of the 1982 Amendment. By its conduct, however, the City's Department of Housing Preservation and Development ("HPD") has repeatedly acknowledged the need for such an agreement, involving the levels far below the rates set forth in the City's Proofs of Claim.

*Continuation of the Shelter Rent Exemption*

In the 1982 Amendment, the City re-confirmed that the Shelter Rent Exemption would be in force through December 31, 1984. The City's conduct after signing the 1982 Amendment demonstrates its understanding that the Shelter Rent Exemption would continue to apply during the "transition' period," <u>i.e.</u>, from January 1, 1985 through the end of the tax exemption period under the PHFL.

On February 29, 1984, the Debtors wrote to the Board of Estimate requesting an extension of the Shelter Rent Exemption. Again on August 24, 1984, the Debtors wrote a letter requesting an extension of the Shelter Rent Exemption. On August 16, 1985, the Debtors wrote a letter to an Assistant Commissioner at HPD requesting information on the status of the application. No response was received from the City.

The delay in answering these requests was not unusual, since the City had granted the Shelter Rent Exemption retroactively on all prior occasions. Indeed, after the supposed expiration of the Shelter Rent Exemption, the City continued to treat the project as if it still enjoyed the exemption on the theory that it was only a matter of time before the Board of Estimate once again reinstated the exemption retroactively. During these years, tax bills were not rendered to the Debtors or alternatively, bills showing no taxes due were submitted.

While the Debtors' Shelter Rent Exemption applications were under consideration, their rents remained modest, in accordance with the Rent Stabilization Law. As a result, the Debtors lacked the funds to pay the far higher taxes that calculated under the stated percentages in the 1968 Amendment -- and had no ability to raise such funds to pay any "past due" taxes under the 1968 Amendment.

HPD continued to review the Debtors' real property taxes, and any corresponding rent increases. On August 26, 1987, HPD wrote to the Debtors and advised that "without accurate financial information we are unable to ascertain either the need for continued tax exemption or whether the housing company is in compliance with the provisions of the regulatory agreement and the Private Housing Finance Law limiting return on equity." The City's response demonstrates that it understood that taxes would be determined consistent with the owners' "return on equity" under the PHFL. This information was subsequently provided.

HPD's review lasted many years, during which the Debtors paid tax escrows required by HUD as mortgagee at "shelter rent" levels. The Debtors' rental charges remained modest, creating an ever widening gap between their revenues and the expenses needed to pay the full taxes now sought by the City. In 1991, HPD completed its review. By letter dated June 18, 1991, HPD recommended that the City Council grant substantial tax exemptions to the Debtors through the end of the twenty-five year term of the Original Agreement (the "1991 HPD Proposal"). HPD's recommendation also included a low "base tax year" for the commencement of the nine year phase-in of full taxes under RPTL § 423. This low base year was especially significant because Section 423 authorized the Debtors to implement rent increases to pass through higher property taxes resulting from the nine year phase-in under RPTL § 423.

On October 25, 1991, the 1991 HPD Proposal appeared on the City Council calendar. The City Council held a brief hearing on the Debtors' application, but made no determination. Instead, the City Council referred the matter back to HPD to obtain additional information from the Debtors, which was subsequently provided. No decision to accept or reject the 1991 HPD Proposal was ever made.

*Prior Bankruptcy Case*

On August 12, 1992, the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. These Debtors filed proofs of claim on behalf of the City using figures from the City's Department of Finance.

In January 1993, the City filed Notices of Lien on Real Property for both buildings. On January 21, 1993, the Debtors filed an objection and moved to disallow the claim. The City's Notice of Lien did not comport with the figures from the City's Department of Finance used for the proof of claim. The Bankruptcy Court directed the City to prepare and deliver a definitive tax bill. In response, the City issued alleged handwritten "bills".

In an effort to resolve the tax issues, the Zukerman Bros., a mortgage holder of the properties, submitted plans of reorganization. Representatives of the Zukerman Bros. also met and conferred with City representatives. These meetings took place in the second half of 1994 because the Debtors needed to prepare audited financial statements for 1991 and 1992 and the City thereafter spent several months examining this financial data.

Zukerman Bros. indicated that it was prepared to consummate a plan of reorganization based on the 1991 HPD Proposal. Throughout the second half of 1994, counsel for the City reported to the Court and the parties that a definitive resolution from HPD and/or the City Council was imminent. At a conference on March 7, 1995, counsel for the City, however, reversed field and advised the Court that she could not report on any progress within the City Council and that it would no longer submit forecasts, since events had proved them unreliable in the past.

As the Debtors continued to press the City for a definitive decision on the Debtors' tax status, the City arbitrarily directed HUD (the mortgage-provider) to pay full taxes as of July 1, 1995, without deciding any outstanding issues. However, the City issued statements to the Debtors for $0.00.

In May 1995, the Bankruptcy Court Judge in the prior bankruptcy proceedings entered an order dismissing the Chapter 11 petitions. Debtors' largest creditor, the City of New York, was not pursuing its tax claims and the Bankruptcy Court declined to exercise jurisdiction to effectuate a judicial resolution of those claims. No ruling was made on the merits of any claim regarding the taxes.

*Post-May 1995-Prepetition Events*

After the bankruptcy court dismissed the prior bankruptcy petitions, the buildings were managed by a Temporary Receiver appointed by the Supreme Court of New York, Queens County, in a mortgage foreclosure action initiated by Zukerman Bros., the holder of a second mortgage on these

properties. Over the Debtors' protests, the Temporary Receiver paid full taxes for these properties. DOC also began to pay full taxes at or about this time. Since 1995, the Debtors have paid full real property taxes to the City, under protest.

In late 1996, the mortgage foreclosure litigation was resolved by settlement and the Temporary Receiver discharged. The Debtors promptly advised the City that they intended to effectuate rent increases under RPTL § 423, to bring their rental income in line with expenses. Several City representatives advised the Debtors that rent increases should be postponed because the City Council would imminently issue a definitive resolution of the Debtors' tax exemptions.

By letters dated March 27, 1997, October 30, 1996 and October 16, 1996, several prominent community members requested that the Debtors forego rent increases on the assurance that City action was imminent.

As a result of the City's failure to render tax bills and its repeated assurances that tax exemptions and other relief would be forthcoming, the Debtors were unable to implement any rent increase or take any corrective action to assure payment of the staggering tax claims first asserted by the City in 1993. From at least 1985 through 1993, there were no distributions from the properties, much less the six-percent return guaranteed by agreement with the City and Section 107 of the PHFL. All of the funds generated by the properties were used to maintain or operate them, to pay pre-existing mortgage obligations, or to pay taxes to the City.

At the conclusion of the tax exemption period, the Debtors are entitled to a nine-year phase in to full taxes under Section 423 of the RPTL and, more important to directly pass through rent increases corresponding to the tax increases. By incorrectly assessing the Debtors for real property taxes at the conclusion of the 25-year term of the Original Agreement, the City has deprived Debtors of these benefits. Whether a 25-year exemption applies under the Original Agreement or a 40-year exemption is afforded under Section 125 of the PHFL (as the Debtors contend), the City has further harmed, and/or threatens to further harm, the Debtors by incorrectly assessing real property taxes at the conclusion of the expiration period.

*The Tax Foreclosure Proceeding*

On or about September 30, 1999, the City commenced a foreclosure action in New York Supreme Court, Queens County, seeking to enforce payment of its tax liens pursuant to Section 11-354 of the New York City Administrative Code. Although no tax bill had been rendered to the Debtors, the City alleged in its Complaint that as of September 29, 1999, there was a total real property tax obligation due and owing against three (3) properties which totaled $53,665,953.43. Shortly after the commencement of the tax foreclosure, HUD removed the action to the United States District Court for the Eastern District of New York, where it was been assigned to Judge Gleeson.

On December 3, 1999, the Debtors interposed an Answer to the City's Complaint denying all essential allegations and alleging various counter-claims related to the Debtors' right to a tax exemption under the applicable agreements outlined above.

On January 24, 2000, the City moved by Order to Show Cause for the appointment of a temporary receiver. On February 2, 2000, the Debtors filed their Chapter 11 Petitions with this Court. The Debtors immediately commenced an adversary proceeding seeking a Declaratory Judgment declaring the automatic stay imposed by Section 362(a) of the Bankruptcy Code, prevented the City from moving for a receiver in the foreclosure action. At the same time, the Debtors moved, by Order to Show Cause, seeking a temporary restraining order ("TRO") which would prohibit the Debtors from seeking the appointment of a receiver. The Application was heard by Chief Bankruptcy Judge Bernstein who determined that the issuance of a TRO was not necessary since District Court Judge Gleeson had already scheduled a hearing on the issue of whether the automatic stay was applicable to the City's motion for a receiver, and the City agreed to limit the issues before Judge Gleason to the applicability of the automatic stay; and forego their original request for the appointment of a receiver.

On February 11, 2000, Judge Gleeson heard argument in connection with the City's allegation that its motion to appoint a receiver in the tax foreclosure proceeding was not subject to the automatic stay, but rather was exempted from the scope of the stay as an "exercise of a municipality's police power." Judge Gleeson found that the motion to appoint a receiver was in fact subject to the automatic stay since the City was seeking such appointment to protect its pecuniary interests. Accordingly, he found the City's actions were subject to the automatic stay.

*The Bankruptcy Court Litigation*

After the finding that the City's tax foreclosure was subject to the automatic stay, the Debtors and the City agreed to have this longstanding dispute resolved by the Bankruptcy Court in the context of the City filing a proof of claim and the Debtors objecting thereto. Accordingly, the City filed claims against each of the Debtors totaling approximately $64,000,000 in the

aggregate and the Debtors objected to such claims. After the matter was fully briefed and argued, the Court rendered a decision.

On December 22, 2000, the Bankruptcy Court issued a lengthy opinion and order resolving part of the Debtors objections. The Court found that there was nothing in the contract claims asserted by the Debtors that entitled them to a guaranteed six percent return on their investment. The Court also found that the City was not estopped from asserting the tax claims and was not guilty of laches or unclean hands. The balance of the objections, including the objection regarding the amount of interest due was reserved and the City was directed to calculate the taxes due in accordance with the opinion.

The Debtors have appealed to the District Court from the Bankruptcy Court's decision. All litigation between the Debtors and the City has been stayed pursuant to the Plan Funding Agreement.

**THE PLAN FUNDING AGREEMENT**

On May 15, 2001, the Debtors and Metrovest concluded negotiations regarding the proposed funding of a plan of reorganization in this case. The Plan Funding Agreement constitutes a comprehensive agreement regarding the acquisition of Debtors' properties by Metrovest, a compromise of the City Claims and a compromise of both the Metrovest Secured Claims and the Zukerman Brother wraparound mortgage claims.

The Debtors sought Bankruptcy Court approval of the Plan Funding Agreement on June 12, 2001 and parties in interest are referred to the Plan Funding Agreement and the application seeking approval of that agreement for the full terms and conditions thereof. It is approval of the Plan Funding Agreement which has allowed this Plan to be proposed by the Debtors and Metrovest.

One of the key features of the Plan Funding Agreement is Metrovest's agreement to provide approximately $15 million dollars to fund the payment of City Claims, the claims of the wraparound mortgagee's as well as fund a capital improvement plan at the properties estimated to cost approximately $10,000,000 together with its contribution of its existing secured claim in the amount of $6,061,788 as of the Petition Date. Metrovest has obtained certain necessary approvals for the capital improvement program as well as the compromise of the City Claims from the necessary City authorities.

Further information regarding the Plan Funding Agreement is also set forth on page 29 of this Disclosure Statement.

## THE METROVEST SECURED CLAIM

The principal secured claim against the Debtors' estates are first priority mortgage claims acquired by Metrovest in January 2001 against 106-20 Shore Front Parkway and 107-10 Shore Front Parkway. The principal amount, as of the Petition Date, of the first referenced mortgage was $2,957,938 and the principal amount of the second reference mortgage, as of the Petition Date, was $3,103,850.

As part of the Plan Funding Agreement, these two mortgages will be satisfied on the Effective Date of the Plan.

## OTHER SECURED CLAIMS

The other secured claims held against the Debtors' estates are the first mortgage Claim of Washington Mutual against the property owned by Dayton Seaside Associates #3 L.P. in the principal amount of $1,740,068.21. Under the Plan Funding Agreement, the full allowed secured claim will be paid Cash on the Effective Date in full satisfaction of such claim.

In addition, the City of New York holds claims against each of the properties on account of real estate taxes in the claimed amount of approximately $64,000,000 as of the Petition Date. Finally, several secured claims are held by Zukerman Bros as wraparound mortgagees against the three properties. The Zukerman Bros. Claims as well as the City's claims are being resolved under the Plan Funding Agreement and the Plan.

## UNSECURED CLAIMS

The body of unsecured claims scheduled by the Debtors or set forth in claims filed against the estate prior to the bar date total approximately $ 133,000. These claims emanate from services rendered to the Debtors as well as other miscellaneous debt. The Plan provides for payment of such debts in full on the Effective Date up to a "cap" of $135,000. In the event claims exceed $135,000, such claims will share *pro rata* in a fund of $135,000.

## INSURED CLAIMS

Approximately $20,000,000 in face amount of insurance claims has been asserted against the Debtors. Such claims arise, almost exclusively, from alleged torts (*i.e.*, "slip and fall" cases) which occurred pre-petition. During the case, the Debtors have negotiated stipulations with some insured claimants, except one, whereby such claimants have waived their claims against the Debtors in their entirety in exchange for limited relief from the automatic stay. Under such

agreements, the claimants were granted relief from the automatic stay and permitted to pursue their claims, *but only* against the insurance policies in force at the time.

## EVENTS LEADING TO CHAPTER 11

### DECISION TO COMMENCE THIS CASE

The decision to seek chapter 11 relief was, in part, caused by the threatened appointment of a receiver by the City of New York in its tax foreclosure action. To prevent a loss of the property, as well as seeking a forum for consolidation of, and prosecution of its litigation against the City, the Debtors determined that filing a chapter 11 case would maximize its opportunity to restructure its finances and propose a plan of reorganization.

## SIGNIFICANT EVENTS IN THE CHAPTER 11 CASE

### RETENTION OF PROFESSIONALS

Section 327(a) of the Bankruptcy Code provides that the Debtors, with the court's approval, may employ one or more accountants or other professional persons that do not hold or represent an interest adverse to the estate and that are disinterested persons to represent or assist the Debtors in carrying out its duties under the Bankruptcy Code. 11 U.S.C. § 327(a).

The Debtors have retained the firm of Robinson Brog Leinwand Greene Genovese & Gluck P.C. as their bankruptcy counsel.

### BAR DATE

In accordance with the requirements of section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, the Debtors have filed its Schedules of its assets and liabilities, including schedules of all of its known creditors and the amounts and priorities of the Claims the Debtors believe are owed to such creditors. Pursuant to section 501 of the Bankruptcy Code any creditor may file a Proof of Claim and, unless disputed, such filed Proof of Claim supercedes the amount and priority set forth in the Debtors' schedules. The Bankruptcy Court set June 13, 2000 as the date for filing Proofs of Claims and Proofs of Interests with the Bankruptcy Court by Creditors and Interest Holders ("Bar Date").

## PROPOSED MOUNTAIN FUNDING LOAN

Shortly after the commencment of this case in February 2000, the Debtors filed a motion seeking authorization from the Court to obtain senior secured credit with priority over all administrative expense claims, from Mountain Funding, Inc. ("MFI"), in the amount of up to $11,250,000. The funds to be supplied by Mountain Funding Inc., which were to have priority over all other secured debt, including the alleged claims of the City of New York, were to be utilized by the Debtors to undertake renovations and repairs at the Debtors three buildings which the City as well as the tenants complained were long overdue. The renovations and repairs included the immediate repair of the facade and parapet wall as well as boiler repairs and roof and window replacements. The Debtors believed that such repairs and renovations would increase the value of the property in an amount in excess of the costs of the repairs. The repairs were also, in the Debtors' view, necessary to facilitate the end of a rent strike at the Buildings which had been initiated, in part, because of the tenants demands for such repairs. The request to obtain this financing was opposed by the City of New York and certain secured creditors of the estate.

Ultimately, the Debtors determined that the scope of the repairs and renovations exceeded the proffered amount of $11,250,000 offered by Mountain Funding Inc. These increases in costs were due to an expansion of the scope of the renovations as well as increased costs for materials. Mountain funding refused to increase the loan to $15,000,000 the amount the Debtor then estimated was necessary to undertake the capital improvement program. Accordingly, the Debtor later withdrew this application.

## APPOLLON GENERAL CONTRACTING CORP FINANCING

Notwithstanding the fact that the proposed MFI financing would not go forward, the Debtors, the City and the secured creditors recognized the need to immediately undertake certain repairs of the façade and parapet wall to remedy a potentially hazardous condition at the property. The Debtors approached Appollon General Contracting Corp., a general contractor, to perform the work at the property. In addition, Appollon agreed to loan the Debtors, on a senior secured basis, the sum of $1,200,000 to finance this repair work. Plans for the work and proposed loan documents were submitted to the secured creditors and they approved same. Accordingly, in July 2000, a stipulation and order was approved by the Court wherein, inter alia, Appollon was permitted to advance the sum of $1,200,000 on a senior secured basis to repair the parapet wall in accordance with the plans approved by all parties in interest.

For a variety of reasons, Appollon never made the loan and did not undertake the repairs. Rather, these repairs are being done by Metrovest under the terms and conditions of the Plan Funding Agreement described below.

## THE PLAN FUNDING AGREEMENT

On May 15, 2001, the Debtors and Metrovest entered into a Plan Funding Agreement which will, among other things, govern the terms and conditions of a plan of reorganization in this case, whether proposed by the Debtors and Metrovest jointly under the Agreement or proposed by the Debtors alone, as may be appropriate under the terms of the Agreement.

Under the Agreement, in exchange for a conveyance of the Debtors' three apartment buildings, the real property they occupy, and related assets, Metrovest shall provide the funds necessary to fund (a) the payment to the City in the amount of $10,000,000 in full satisfaction of the City's real property tax claims as well as such funds which are necessary to otherwise procure the City's consent to the Agreement, (b) satisfaction of the mortgages held by Metrovest and Washington Mutual, (c) payments to acquire the Wraparound Mortgages held by Zukerman Bros, (d) up to $1,200,000 to fund repairs authorized in accordance with the Court's order of July 7, 2000, and (e) payments necessary to fund Allowed Administrative and General Unsecured Claims against the Debtors. Moreover, limited partners (exclusive of any limited partnership interests which may be held by Zukerman Bros.) of the Debtors shall have a one-time right to participate in the restructuring of the Debtors by paying their proportionate share of the Funding under the Plan to the Successor Entity and execute appropriate guaranties in exchange for corresponding interests in such entity. In connection therewith, the Plan will provide for the transfer of the Buildings to Metrovest or its designees.

Metrovest has deposited the sum of $500,000 with counsel for the Debtors to be held in an interest bearing escrow account in connection with the acquisition by Metrovest of the wraparound mortgages held by Zukerman Bros. in accordance with paragraph 3.6 of the Agreement. Such Deposit will be forfeited in the event that Metrovest willfully fails to meet its obligation to fund the Plan under section 3.1 of the Agreement, after satisfaction of all conditions precedent to their obligations or otherwise willfully defaults or if Metrovest refuses to fund the Plan based upon the Court's rulings or potential rulings on issues related to the rejection of certain contracts and/or resulting claims. Other than its right to receive payment for the Wraparound Mortgages, which right will be paid in cash or secured by outside collateral, the Zukermans will have no continuing interest in the Buildings.

In addition, the Agreement provides authorization for the Debtors to use cash collateral in which Metrovest alleges an interest during this case. Metrovest will be given the right to (i) oversee all expenditures made in connection with the Buildings, (ii) during the term of the Agreement, to approve or disapprove all new leases and (iii) to manage and to control the construction work proceeding at the Buildings.

Previously, on or about July 7, 2000, this Court approved, with the consent of the City and all secured creditors of the estate, a stipulation and order permitting Appollon Roofing and Waterproofing to lend certain funds to the estate and perform up to $1,200,000 of repairs at the Buildings in accordance with plans approved by the City and the mortgagees. Under the Agreement, Metrovest has agreed to substitute itself in the place of Appollon except that the maturity date of the loan will be 18 months after the funds are advanced unless there is an event of default, conversion or dismissal of the case or by the Debtors to propose a plan which does not conform to the Agreement, in which case, in addition to the other rights and remedies available to Metrovest, the loan, together with the mortgages assigned by HUD to Metrovest, shall be immediately due and payable. The monies advanced for these repairs, (together with all other monies due Metrovest, including its costs and expenses) shall also be due and payable on the effective date of any alternative plan of reorganization proposed by the Debtors within sixty (60) days following expiration of the 120 day joint exclusivity period.

Metrovest's obligation to fund the Plan is subject to several conditions regarding the timing of certain events. Under Article 4 of the Agreement, the deadline for Court approval of the Agreement was June 15, 2001 and the Court actually approved the Agreement on June 12, 2001. Such provisions require that the Plan be confirmed by December 15 and become effective on or before December 31, 2001.

Under the Agreement, Zukerman has agreed to have all of the Wraparound Mortgages and any other interests Zukerman Bros. may have in the Buildings, acquired by Metrovest under the Plan. The interests evidenced by the Wraparound Mortgages will be acquired for a payment totaling $5,000,000 of which $500,000 consists of the Deposit, $3,300,000 to be paid on the Effective Date of a plan plus a payment of $1,200,000 plus interest which is deferred for seven years with the deferred portion secured by AA rated bonds or an AA rated insurance company. All deferred payments (including unmatured interest) will be accelerated in the event of a sale of the Buildings or a conversion of any of the Buildings.

It will be an event of default if (i) if the Debtors assert the Agreement is not binding, is invalid or illegal, (ii) a motion to approve the Agreement is not filed by May 18, 2001, (iii) subject to the conditions in section 4.2, a plan and disclosure statement are not filed by September 15, 2001 and the order confirming the Metrovest Plan has not been entered by December 15, 2001, (iv) subject to the conditions in section 4.2, the Metrovest Plan does not become effective by December 31, 2001, (v) if the Bankruptcy Cases are (a) converted to chapter 7, (b) dismissed or (c) the Debtors seek to confirm a plan not consented to by Metrovest or otherwise permitted under the Agreement or (vi) an Interested Party shall cause the failure to obtain Court approval of the Agreement or Disclosure Statement as provided for in the Agreement.

The remedies in the event of a default under the Agreement are set forth in Article 6.2 of the Agreement and include (i) a return of the Deposit and all interest earned thereon, subject to the provisions of section 2.1 of the Agreement, (ii) that the Loan shall become immediately due and payable and (iii) that Metrovest would be entitled to injunctive relief. The rights of the parties in the event of a termination of the Agreement are set forth in Article 9.

In the event Metrovest is unable to satisfy the conditions set forth in section 4.2 related to evidence of ability to fund the Plan and obtaining all requisite City approvals within 120 days from the date of the Agreement, then Metrovest shall be bound to vote to accept a Plan proposed by the Debtors within the sixty (60) days thereafter that provides for payment of the Metrovest mortgages in full with interest and provides for payment of the Loan of $1,200,000 and all of Metrovest's expenses and reasonable legal fees associated with these Chapter 11 cases. Metrovest obtained the necessary timely approvals. The right of the Debtors to propose a plan under the Agreement which Metrovest must accept is preserved through the extension of exclusivity set forth in Article 10 of the Agreement as well as the provisions of Article 4 and 9 which provide for this provision to survive a termination of the Agreement.

The Agreement may be terminated by agreement of the parties, in the event any Interested Party intentionally fails to perform under the Agreement or refuses to consummate the transactions contemplated by the Agreement or upon the occurrence of an Event of Default under Article 6 which remains uncured five (5) business days after notice thereof.

As noted above, by order dated June 12, 2001, the Bankruptcy Court approved the Plan Funding Agreement and thereafter, Metrovest paid the $500,000 deposit.

**OPERATING REPORTS**

Pursuant to the requirements of the Office of the United States Trustee for the Southern District of New York, the Debtors have regularly prepared and filed monthly operating reports with the Bankruptcy Court detailing the results of the Debtors' ongoing business operations. Copies of such reports may be obtained from the Bankruptcy Court during normal business hours, or may be obtained upon written request made to counsel for the Debtors.

**SUMMARY OF THE PLAN**

The following summary of the terms of the Plan is qualified in its entirety by reference to the provisions of the Plan, a copy of which accompanies this Disclosure Statement and which is incorporated herein by reference.

**Classification of Claims and Interests**

Article 3 of the Plan classifies the various Claims against and Interests in the Debtors into five classes of Claims and one class of Interests:

| | | |
|---|---|---|
| Class 1 | - | Priority Claims |
| Class 2 | - | Metrovest Secured Claim |
| Class 2A | - | Washington Mutual Secured Claim. |
| Class 3 | - | Wrap Mortgage Secured Claim |
| Class 4 | - | City Claims. |
| Class 5 | - | Unsecured Claims |
| Class 6 | - | Allowed Insured Claims |
| Class 7 | - | Allowed Limited Partnership Interests |
| Class 8 | - | Allowed General Partnership Interests |

Claims in Classes 2, 3 ,4 , 5 and 6 and Interests in Classes 7 and 8 are impaired under the Plan. Holders of Claims and Interests in such Classes are therefore being solicited and are entitled to vote to accept or reject the Plan. Claims in Classes 1 and 2A are not impaired by the Plan and are deemed to have accepted the Plan. As set forth in Article 2 of the Plan, pursuant to section 1123(a)(1) of the Bankruptcy Code, certain Administrative Claims against the Debtors have not been classified. See

"SUMMARY OF THE PLAN -- Treatment of Non-Classified Claims."

**Class 1 - Priority Claims.** Class 1 consists of all Allowed Claims, other than Administrative Claims or Bankruptcy Fees, to the extent entitled to priority under section 507 of the Bankruptcy Code. Claims that may be classified in Class 1 may include, for example, certain claims of employees of the Debtors for wages, salaries and commissions or contributions to employee benefit plans up to an aggregate amount of $4,300 per employee. Certain Claims for taxes and the payment of expenses incurred by the Debtors subsequent to the Petition Date are entitled to priority under section 507 of the Bankruptcy Code, and are treated elsewhere as non-classified Claims. See "SUMMARY OF THE PLAN -- Treatment of Non-Classified Claims." The Debtors believe that the total claims in this class aggregate less than $1,000.

**Class 2 –Metrovest Secured Claim.** Class 2 consists of the Secured Claim of Metrovest. as set forth in the Plan Funding Agreement previously approved by the Court.

**Class 2A – Washington Mutual Secured Claim**. Class 2A consists of the Secured Claim of Washington Mutual.

**Class 3 -- Wrap Mortgage Secured Claims.** Class 3 consists of the wrap mortgage and other secured claims of Zukerman Brothers.

**Class 4 – City Claim.** Class 4 consists of all secured claims held by the City of New York on secured by any real property owned by the Debtors.

**Class 5 – Unsecured Claims.** Class 5 consists of all Unsecured Claims

**Class 6 – Allowed Insured Claims.** Class 6 consists of all Allowed Insured Claims.

**Class 7 – Allowed Limited Partnership Interests.** Class 7 consists of all Allowed Limited Partnership Interests in the Debtors held by its limited partners.

**Class 8 – Allowed General Partnership Interests.** Class 8 consists of all Allowed General Partnership Interests in the Debtors held by any of its general partners.

**TREATMENT OF CLAIMS AND INTERESTS CLASSIFIED UNDER THE PLAN**

Articles 4 and 5 of the Plan provide for the treatment of impaired and unimpaired Claims and Interests classified in Article 3 of the Plan as follows:

**Class 1 - Priority Claims.** Subject to the provisions of article 8 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of the Priority Claims, the holders of Priority Claims shall receive in Cash, in the full amount of its Priority Claim to be paid by the Disbursing Agent from the Plan Fund.

**Class 2 - Metrovest Secured Claim.** In full satisfaction of the Metrovest Secured Claim, Metrovest shall received the consideration provided for under the Plan Funding Agreement and the Metrovest Secured Claim shall be deemed satisfied and discharged on the Effective Date. Parties in interest are referred to the discussions on pages 25 and 29 for a further description of the Plan Funding Agreement.

**Class 2A - Washington Mutual Secured Claim.** In full satisfaction of the Washington Mutual Secured Claim, on the Effective Date, Washington Mutual will receive payment in full, in Cash, of its Allowed Secured Claim to be paid from the Plan Fund.

**Class 3 - Wrap Mortgage Secured Claim.** In full satisfaction of the Wrap Mortgage Secured Claims, on the Effective Date, Zukerman Bros. shall receive the consideration provided for in the Plan Funding Agreement. Parties in interest are referred to the discussions on pages 25 and 29 for a further description of the Plan Funding Agreement.

**Class 4 - City Claims.** In full satisfaction of the City Claims, on the Effective Date, the City shall receive (i) the sum of $10,000,000 in Cash to be paid from the Plan Fund, in full satisfaction of all City Claims against the Debtors and/or the Dayton Operating Property, the Dayton 2 Property and the Dayton 3 Property (ii) the Successor Entity shall agree to limit the otherwise available MCI Rent Increases applicable to apartments at the Properties relating to the Repairs to be performed under the Plan by electing to receive increases at 10.58% to be phased in over a two year period as follows: (1) 6% on the first anniversary of the Effective Date and (2) 4.58% on the second anniversary of the Effective Date. In addition, Metrovest will be entitled to a J-51 Tax Abatement in the amount of $74,668 per year for the twenty (20) years commencing with the first anniversary of the Effective Date. Metrovest will complete the Repairs in compliance with the schedule annexed to the Plan as Exhibit "A". With respect to any claims of the City of New York relating to unpaid real estate taxes with respect to the Parking Lot at the election of the Successor Entity, either (i) such claims shall be satisfied by the Successor Entity or (ii) the Parking Lot shall be abandoned by the Reorganized Debtor.

**Class 5 - Unsecured Claims.** Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, and subject to a cap of $135,000, on the Effective Date, each holder of an Unsecured Claim shall receive payment in Cash equal to one hundred (100%) percent of the Allowed amount of such Class 5 Claim, plus interest thereon at the rate of six and one-half (6.50%) percent from the Petition Date, to be paid by the Disbursing Agent from the Plan Fund. To the extent Allowed Unsecured Claims exceed $135,000, then the holder of each Class 5 Claim shall be paid its pro-rata share of $135,000 in full satisfaction of such Allowed Class 5 Claim.

**Class 6 - Allowed Insured Claims**. The holders of Allowed Class 6 Claims shall retain their claims against the Debtors solely to the extent of applicable insurance coverage.

**Class 7 - Allowed Limited Partnership Interests.** Prior to the Confirmation Hearing in the manner set forth in the Disclosure Statement at pages 6-7, all holders of Allowed Limited Partnership Interests shall have a one time opportunity to elect to retain such interests in the Successor Entity, as defined in the Plan Funding Agreement, in exchange for (i) a contribution of Cash equal to such Limited Partner's Pro-Rata share of the cash component of the Plan Funding Amount plus (ii) such Limited Partners unconditional personal guaranty of their Pro-Rata share of any monies borrowed by the Successor Entity to fund the Plan Funding Agreement and funds required to complete the renovations set forth in Exhibit "A" hereto. Any Limited Partner which does not contribute and guaranty the amounts required to fund the Plan Funding Amount and otherwise complete the obligations required under this Plan shall have their interest cancelled as of the Effective Date. Any election made under this section of the Plan must be made on the Class 7 Interest Holders ballot accepting or rejecting the Plan and the Cash component must accompany any ballot accepting the Plan in the form of certified funds in order for the holder of such Allowed Interest to retain such

interest after the Effective Date. All ballots which purport to accept the Plan and are not accompanied by the Cash component and a duly executed personal guaranty shall result in such interest holder's interest in the Debtors being terminated on the Effective Date. The Cash component tendered hereunder shall be held by counsel to the Debtors in an interest bearing escrow account until the Effective Date.

**Class 8 - Allowed General Partnership Interests.** On the Effective Date, all Allowed General Partnership Interests in the Debtors shall be deemed cancelled.

TREATMENT OF NON-CLASSIFIED CLAIMS

Pursuant to section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims entitled to priority treatment under section 507(a)(1) of the Bankruptcy Code or Claims of Governmental Units entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code. Article 2 of the Plan provides for the manner of treatment of such non-classified Claims.

**Administrative Claims.** Administrative Claims are the costs and expenses of administration of this Case, allowable under section 503(b) of the Bankruptcy Code, other than Bankruptcy Fees. Administrative Claims include Claims for the provision of goods and service to the Debtors after the Petition Date, the liabilities incurred in the ordinary course of the Debtors' businesses (other than claims of governmental units for taxes or interest or penalties related to such taxes) after the Petition Date, Claims of professionals, such as attorneys (including counsel to Metrovest and certain legal fees identified in the Plan Funding Agreement), appraisers, and accountants, retained pursuant to an order of the Bankruptcy Court, for compensation and reimbursement of expenses under section 330 of the Bankruptcy Code, and tax claims for the period from the Petition Date to the Effective Date of the Plan.

Each Administrative Claim, to the extent not previously paid, shall be paid by the Disbursing Agent in Cash in full from the Plan Fund on (i) the later of the Effective Date, the date payment of such Claim is due under the terms thereof or applicable law, or three business days after such Claim becomes an Administrative Claim or (ii) as may be otherwise mutually agreed in writing between the Disbursing Agent and the holder of such Claim; *provided, however,* that any Administrative Claim incurred by the Debtors in the ordinary course of its business shall be paid in full or performed by the Reorganized Debtors in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto.

Article 2 of the Plan sets a final date for the filing of Administrative Claims against the Debtors. The Administrative Bar Date is the first Business Day that is at least 60 days after the Effective Date.

Section 330 of the Bankruptcy Code sets the standard for the determination by the Bankruptcy Court of the appropriateness of fees to be awarded to Professionals retained by the Debtors in a case under the Bankruptcy Code. In general, bankruptcy legal services are entitled to command the same competency of counsel as other cases. "In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable service other than in a case under title 11." 124 Cong. Rec. H11091 (Daily ed. Sept. 28, 1978).

**Bankruptcy Fees.** All fees and charges assessed against the Debtors under section 1930 of title 28 of the United States Code shall be paid by the Disbursing Agent from the Plan Fund, in Cash in full as required by statute.

**Professional Fees.** Reasonable compensation due to the Debtors' professionals pursuant to section 329 of the Bankruptcy Code, as determined by the Bankruptcy Court, shall be payable in full and in Cash on the Effective Date unless otherwise agreed to in writing between the holder of such claim and the Debtors and approved by the Bankruptcy Court. Unless otherwise agreed to in writing by the Debtors and the applicable professional, each professional must serve the Debtors with a writing indicating the sum of fees and expenses they intend to apply to the Court for reimbursement of and/or an award of, no later than ten days prior to the Effective Date. Upon receipt of such notice, the Debtors must escrow sufficient funds, to be held in an interest bearing segregated account, in the amounts necessary to pay such claims when and if allowed by the Court. Metrovest intends to seek reimbursement of its counsel fees based upon, *inter alia*, Metrovest's substantial contribution to this case.

## DISPUTED CLAIMS AND INTERESTS

Article 8 of the Plan contains a mechanism for resolving disputes concerning the amount of certain Claims or Interests asserted against the Debtors by any Entity.

**Time to Object.** Unless otherwise ordered by the Bankruptcy Court, objections to the allowance of any Claim or Interest may be filed no later than the later to occur of (i) 60 days after the Effective Date or (ii) 60 days after the date proof of such Claim or Interest is filed. Until the earlier of (i) the filing of an objection to a Proof of Claim or Interest or (ii) the last date to file objections to Claims or Interests as established by the Plan or by Final Order, Claims or Interests shall be deemed to be Disputed in their entirety if, (i) the amount specified in a Proof of Claim or Interest exceeds the amount of any corresponding Claim or Interest listed in the Schedules; (ii) any corresponding Claim or Interest listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (iii) no corresponding Claim or Interest has been listed in the Schedules.

# DISTRIBUTIONS UNDER THE PLAN

Article 8 contains provisions governing the making of distributions on account of Claims and Interests. In general, any payments, distributions or other performance to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest shall be deemed to be timely made if made on or within five days following the later of following the later of (i) the Effective Date or (ii) the expiration of any applicable objection deadline with respect to such Claim or Interest or (iii) such other times provided in the Plan. All Cash payments to be made by the Debtors pursuant to the Plan shall be made by check drawn on a domestic bank.

**Disbursing Agent.** The Debtors shall be the Disbursing Agent to make distributions under the Plan. The Disbursing Agent shall not be compensated for services rendered under the Plan. Pursuant to the terms of the Plan, the Disbursing Agent shall post a bond in an amount mutually agreed to by the Debtors, Metrovest and the United States Trustee or, absent such agreement, as fixed by the Bankruptcy Court at the Confirmation Hearing.

Distributions shall be made: (1) at the addresses set forth on the Proofs of Claim or Proofs of Interests filed by such holders; (2) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (3) at the address reflected in the Schedules if no Proof of Claim or Proof of Interest is filed and the Disbursing Agent has not received a written notice of a change of address. If the distribution to the holder of any Claim or Interest is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified in writing of such holder's then current address. The Debtors shall not be required to attempt to locate any holder of an Allowed Claim or an Allowed Interest.

# UNCLAIMED DISTRIBUTIONS

Any Cash or other property to be distributed under the Plan shall revert to the Debtors if it is not claimed by the Entity entitled thereto before the later of (i) 1 year after the Effective Date or (ii) 60 days after an Order allowing the Claim of that Entity becomes a Final Order or are otherwise Allowed.

# DISTRIBUTIONS WITH RESPECT TO DISPUTED CLAIMS

During the pendency of any objection to any Claim or Interest, no distribution under the Plan will be made to the holder of such Claim or Interest. However, subject to the restrictions set forth in the next paragraph, there will be set aside and reserved on behalf of such disputed Claim or Interest such cash or property as the holder thereof would be entitled to receive in the event such Claim or Interest was an Allowed Claim or an Allowed Interest on the date of such distribution. The

Debtors may seek an order of the Bankruptcy Court estimating or limiting the amount of Cash or property that must be deposited in respect of any such disputed Claims or Interests. Cash held in reserve for disputed Claims will be held in trust for the benefit of the holders of such Claims.

The amount to be so segregated on behalf of Disputed Claims depends upon whether such claim is an Unsecured Claim or a claim other than an Unsecured Claim. If a Disputed Claim is not an Unsecured Claim, the Disbursing Agent shall segregate Cash equal to 100% of the amount which would be distributed on account of such Disputed Claim if such Claim had been an Allowed Claim but for the pendency of the objection. Until such the dispute over the claim is resolved, the Disbursing Agent shall also segregate any interest or dividends earned upon such amount it is holding on account of such Disputed Claim.

If the Disputed Claim would have been an Allowed Unsecured Claim but for the pendency of such objection, the Disbursing Agent shall be obligation to segregate an amount equal to 100% of the amount which would have been distributed on account of such Claim if such Claim had been an Allowed Claim on such date. Deposits in escrow on account of any Disputed Unsecured Claims shall be made annually thereafter, at least ten days prior to the anniversary of the Effective Date until all pending disputes are resolved. The Disbursing Agent shall also hold any interest or dividends earned on such funds until the dispute over such claim is resolved.

Within 30 days after the entry of a Final Order resolving an objection to a Disputed Claim, the Disbursing Agent shall distribute all Cash or other property held in escrow with respect to such claim, including any interest, dividends or proceeds thereof, to which a holder is then entitled with respect to any formerly Disputed Claim that has become an Allowed Claim. To the extent practicable, the Disbursing Agent may invest any Cash or other property segregated on account of a Disputed Claim, Disputed Interest undeliverable distribution, or any proceeds thereof; however, the Disbursing Agent shall be under no obligation to so invest such Cash or proceeds and shall have no liability to any party for any investment made or any omission to invest such Cash, other property or proceeds. Any segregated amounts remaining after all Disputed Claims and Interests have been resolved will be retained by the Debtors.

## SURRENDER OF INSTRUMENTS

Notwithstanding the foregoing, no Creditor or Interest Holder that holds a note or other instrument of the Debtors evidencing such Creditor's Claim or Interest may receive any distribution with respect to such Claim or Interest unless and until the note or other instrument evidencing such Claim or Interest is surrendered pursuant to the provisions of section 8.11 of the Plan. That section also contains specific provisions governing lost, stolen, or mutilated notes and instruments, including the requirement that reasonable indemnification be provided to the Disbursing Agent for such exchange.

## COMPLIANCE WITH TAX REQUIREMENTS

In connection with the Plan, the Disbursing Agent shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and distributions under the Plan shall be subject to such withholding and reporting requirements.

## EFFECTIVE DATE

The Effective Date of the Plan is defined as the day thirty (30) days after the Confirmation Date. The Confirmation Date means the date on which the Bankruptcy Court enters the Confirmation Order provided such order thereafter becomes a Final Order.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, and except as set forth in section 6.1 of the Plan and set forth on a schedule to be filed with the Court prior to the Confirmation Date, all executory contracts and unexpired leases to which the Debtors are a party shall be deemed rejected under the Plan in accordance with section 365 of the Bankruptcy Code.

**Assumption Cure Payments**. Subject to the provisions of Section 6.3 of the Plan, and, any Cash required to be paid to cure any monetary default under any Executory Contract or Unexpired Lease to be assumed pursuant to Section 6.1 of the Plan shall be paid in Cash on the Effective Date from the Plan Fund.

With respect to each Executory Contract to be assumed pursuant to Section 6.1 of the Plan, in the event a dispute is pending regarding (i) the amount of the Cure Amount, (ii) adequate assurance of future performance, or (iii) any other matter pertaining to assumption of such Executory Contract, then no payments shall be made to cure any default under such Executory Contract until the entry of a Final Order resolving such dispute. At any time while such dispute is pending, the Debtors may file with the Bankruptcy Court a notice rejecting such executory contract or lease in which case

such contract or lease shall be deemed rejected on the Effective Date and any claim arising from such rejection shall be treated as a pre-petition claim.

A Proof of Claim or request for payment of an Administrative Expense with respect to any Claim arising from, or in connection with, the assumption of an Executory Contract or Unexpired Lease (including, but not limited to, any Cure Amount arising under section 365(b)(1) of the Bankruptcy Code) shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtors within 30 days after the later of (i) the date of entry of a Final Order approving such assumption, or (ii) the Confirmation Date. Any such Proof of Claim or request for payment of an Administrative Expense not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtors or their successors or their respective properties, and shall be, in all respects subject to the provisions of Article 9 hereof. The Debtors intend to request that the foregoing limitation on the filing of requests for payment of Administrative Expenses be included in the Confirmation Order. In such claim, notice of such limitation will be served upon the parties adversely affected thereby.

## METROVEST DOES NOT ANTICIPATE ASSUMING ANY EXECUTORY CONTRACTS EXCEPT FOR ALL UNEXPIRED LEASES WITH TENANTS.

Metrovest intends to assume all unexpired leases with tenants, and does not anticipate that any cure payments are due with respect to such leases. Certain tenants have asserted "rent overcharge" claims against the Debtors. Metrovest does not believe that these claims are valid and will file objections to these claims prior to confirmation.

**Rejection Claims**. Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease of the Debtors pursuant to the Plan shall be treated as Unsecured Claims. A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Disbursing Agent within 30 days after the later of (i) the date of entry of a Final Order approving such rejection (unless such Final Order expressly provides a Bar Date with respect to such Claim, in which event no Proof of Claim with respect to such Claim shall be deemed timely unless it is filed with the Bankruptcy Court and served in the manner provided in such Final Order), or (ii) the Confirmation Date. Any such Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtors, or their successors or their respective properties. The Debtors intend to request that the foregoing limitation on the filing of claims be included in the Confirmation Order. In such claim, notice of such limitation will be served upon the parties adversely affected thereby.

## Rejection of Union Contracts

Each of the Debtors is a party to a contract with Local 32B-32J Service Employees International Union AFL-CIO. Metrovest has informed the Debtors that it intends to take the property in transfer from the Debtor free and clear of all claims, liens, interest and encumbrances including the Union contract and if necessary cause the Debtor to reject all of the agreements between the Union and the Debtors under the Plan. In the event the Court fails to confirm the Plan because of the proposed treatment of the Union Contracts, Metrovest shall have the option in its sole discretion to modify the Plan to overcome such objection or it will forfeit its deposit under the Plan Funding Agreement and the Debtor shall have the time period set forth in the Plan Funding Agreement to pursue an alternative plan.

## Vesting of Assets

Except as otherwise provided in the Plan Funding Agreement and except for those assets transferred to the Successor Entities as part of the Sale, on the Effective Date all of the assets of the Estate shall revest in the Reorganized Debtors free and clear of all Liens, Claims and encumbrances. On the Effective Date any and all Liens, Claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date.

Following the Effective Date through the closing of the Debtors' chapter 11 cases, the Debtors may settle and compromise any claims, interests and causes of action in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

## Preservation of Rights of Action

Except as otherwise provided in the Plan, the Plan Funding Agreement or in any contract, instrument, release or other agreement entered into in connection with the Plan, the Debtors shall retain, and in accordance with its determination of the best interest of the estate, may enforce any claims, rights and causes of action (i) arising under sections 544 through 550 of the Bankruptcy Code or (ii) belonging to the Debtors as of the Petition Date, or the Estate, and arising under any provision of state or federal law, or any theory of statutory or common law or equity. Any recovery received by the Debtors through the prosecution, settlement or collection of any such claim, right or cause of action, shall be treated as Available Cash.

Notwithstanding any provision of the Plan to the contrary, definitions and descriptions contained herein respecting pre-Petition Date documents, agreements or claims are provided solely for the purpose of identification and classification thereof and do not constitute an admission by the Debtors of the existence, validity allowance, or amount of any such claim, document or agreement.

The Debtors and the Reorganized Debtors expressly reserves the right to challenge the existence, validity allowance, or amount of any such claim, document or agreement.

**TRANSFER TAXES**

Pursuant to section 1146(c) of the Bankruptcy Code, the initial issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer in connection with or in furtherance of the Plan (including any instrument executed in furtherance of the transactions contemplated by articles 5 or 7 of the Plan within three (3) years from the Effective Date) shall be exempt and shall not be subject to tax under any law imposing a Transfer Tax, mortgage recording tax or similar tax as set forth in the Plan.

**REVOCATION OF THE PLAN**

Subject to the provisions of the Plan Funding Agreement, the Debtors may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If the Debtors revoke or withdraw the Plan, or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall constitute a waiver or release of any Claims by or against, or any Interest in, the Debtors; or prejudice in any manner the rights of the Debtors in any further proceedings involving the Debtors.

**RETENTION OF JURISDICTION**

The Plan contains detailed provisions providing for the retention of jurisdiction by the Bankruptcy Court over the Case for the purposes of, *inter alia,* determining all disputes relating to Claims or Interests and other issues presented by or arising under the interpretation, implementation or enforcement of the Plan, and to determine all other matters pending on the date of confirmation.

## RISK FACTORS

The Plan significantly restructures the Debtors' obligations to their Creditors. Although the Debtors believe that the Debtors will be able to meet all of the obligations that they are undertaking pursuant to the Plan there can be no assurance that future events will not cause the Debtors to default on one or more of its obligations under the Plan. Each Creditor, Interest Holder and their respective advisers, should consider the following factors (and other risks considered elsewhere in this Disclosure Statement).

## RISK OF SUBSEQUENT REORGANIZATION OR LIQUIDATION

Although the Debtors believe that the confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors, there can be no assurance that such liquidation will not occur or that the need for such financial reorganization will not arise.

## RISKS RELATED TO RENOVATIONS/RECONSTRUCTION

The Plan requires that extensive renovations be formed at each of the buildings. These renovations, set forth in Exhibit "A" to the Plan, will be completed over approximately 24 months after the Effective Date. The renovation also entails the risk that the projected costs and expenses of the construction will have been underestimated. However, any delay or increased construction costs will not impact the distributions to be made to creditors. Such increased renovation costs, if any, will be borne by Metrovest and those Limited Partners who desire to continue their interests in the Successor Entity/Entities as permitted under the Plan.

## OPERATIONAL/FUNDING RISKS

Since the Plan has proposed calls for all payments to be made to creditors (or for reserves to be established) on the Effective Date, many of the normal operational risks of a Plan of Reorganization that provides for payments over time are simply not present in this Plan. Moreover, it is a condition of proposing the Plan that Metrovest, the Plan Funder, has demonstrated it has obtained a commitment from a lender in an amount sufficient to fund the Plan and obtained all necessary approvals from the City of New York needed to effectuate the compromises required under the Plan. Thus, the Debtors and Metrovest do not believe the Plan entails any operational or funding risk to creditors.

## VOTING INSTRUCTIONS

A Creditor or Interest Holder who is entitled to vote may accept or reject the Plan by executing and returning to the Balloting Agent (as defined below) the ballot (a "Ballot") that was sent out with this Disclosure Statement. See "VOTING INSTRUCTIONS -- Who May Vote." The following instructions govern the time and manner for filing Ballots accepting or rejecting the Plan, withdrawing or revoking a previously filed acceptance or rejection, who may file a Ballot, and procedures for determining the validity or invalidity of any Ballot received by the Balloting Agent.

**DEADLINE FOR RECEIPT OF BALLOTS**

The solicitation period for votes accepting or rejecting the Plan will expire at 5:00 p.m., Eastern Standard Time, on _____, 2001 (the "Voting Deadline"). A Ballot accepting or rejecting the Plan must be received no later than that date and time or it will not be counted in connection with the Confirmation of the Plan or any modification thereof.

**BALLOTING AGENT**

All votes to accept or reject the Plan must be cast by using the Ballot. Executed Ballots should be returned by _____, 2001, to:

> Robinson Brog Leinwand Greene Genovese & Gluck P.C.
> 1345 Avenue of the Americas
> 31st Floor
> New York, New York 10105
> Attn: Dayton Ballots

(the "Balloting Agent"). A Creditor or Interest Holder entitled to vote whom has not received a Ballot, or whose Ballot has been lost, stolen or destroyed, may contact the Balloting Agent at the address indicated above, or call at (212) 586-4050 to receive a replacement Ballot.

**WHO MAY VOTE - IN GENERAL**

Claims in Classes 2, 3, 4, 5 and 6 and Interests in Classes 7 and 8[5] are impaired under the Plan. Holders of Claims and Interests in such classes are therefore being solicited and are entitled to vote to accept or reject the Plan. Claims in Classes, to the extent allowed, 1 and 2A are not impaired by the Plan and are deemed to have accepted the Plan.

**Ballots Executed in a Representative or Fiduciary Capacity**. Ballots executed by Debtors, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity, must indicate the capacity in which such person executed the Ballot and, unless otherwise determined by the Debtors, must submit proper evidence satisfactory to the Debtors of their authority to so act.

**Voting Multiple Claims and Interests**. A single form of ballot is provided for each Class of Claims or Interests. Any Person who holds Claims or Interests in more than one Class is

---

[5] Holders of interests on Class 8 may be deemed to have rejected the Plan in accordance with section 1126(g) of the Bankruptcy Code. Nevertheless, the Debtors are soliciting acceptances from such class of Interest Holders.

required to vote separately with respect to each Class in which such Person holds Claims or Interests. However, any Person who holds more than one Claim or Interest in one particular Class will be deemed to hold only a single Claim or Interest in such Class in the aggregate amount of all Allowed Claims or Allowed Interests in such Class held by such Person. Thus each Person need complete only one ballot for each Class. **However, the holder of a claim against more than one Debtor must file a ballot on account of each claim held against each Debtor.**

## PENDING OBJECTIONS

No Ballot cast with respect to any Claim or Interest, which is the subject of a pending objection, will be counted for purposes of determining whether the Plan has been accepted or rejected, unless the holder of such Claim or Interest makes an application to the Bankruptcy Court to have such claim temporarily allowed for voting purposes only under Fed. R. Bankr. P. 3018(a) and the Court grants such application after appropriate notice and a hearing.

## DEFECTS OR IRREGULARITIES

**ANY EXECUTED AND TIMELY FILED BALLOT WHICH DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO <u>BE AN ACCEPTANCE</u> OF THE PLAN.** Where more than one timely and properly completed Ballot is timely received, the Ballot which bears the latest date will be counted.

The Debtors reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the deadline for filing timely Ballots. Neither the Debtors, the Balloting Agent, nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liability for failure to provide such notification. All questions as to the validity, form, eligibility (including the time of receipt), acceptance and revocation or withdrawal of Ballots will be determined by the Bankruptcy Court, upon motion and upon such notice and hearing as is appropriate under the circumstances. Unless otherwise directed by the Bankruptcy Court, delivery of Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots as to which any irregularities have not been cured or waived will not be counted toward the acceptance or rejection of the Plan.

## REVOCATION OF PREVIOUSLY FILED ACCEPTANCES OR REJECTIONS

Any Creditor or holder of an Equity Interest who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Balloting Agent at any time prior to the Voting Deadline.

A notice of withdrawal, to be valid, must (i) describe the Claim or Equity Interest, as the case may be, if appropriate, represented by such Equity Interest or Claim, (ii) be signed by the Creditor or Interest Holder, as the case may be, in the same manner as the Ballot was signed and (iii) be received by the Balloting Agent on or before the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawals of Ballots.

**ACCEPTANCE AND CONFIRMATION**

**CONFIRMATION HEARING**

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Plan. The Confirmation Hearing is scheduled to commence on _____, 2001 , at __:00 __.m. in the United States Bankruptcy Court, Alexander Hamilton Customs House, One Bowling Green, Room _____, New York, New York 10004. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before _____, 2001 Objections must be served upon (i) Robinson Brog Leinwand Greene Genovese & Gluck P.C., 1345 Avenue of the Americas, New York, New York 10105-0143, Attn.: Fred B. Ringel, Esq., (ii) Morrison Cohen Singer & Weinstein, LLP , 750 Lexington Avenue, New York, New York 10022, Attn: Thomas R. Califano, Esq. and (iii) United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004.

**REQUIREMENTS FOR CONFIRMATION**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. These requirements include determinations by the Bankruptcy Court that: (i) the Plan has classified Claims and Interests in a permissible manner, (ii) the contents of the Plan comply with various technical requirements of the Bankruptcy Code, (iii) the Debtors have proposed the Plan in good faith, (iv) the Debtors have made disclosures concerning the Plan that are adequate and include information concerning all payments made or promised in connection with the Plan and the Case, (v) the Plan is in the "best interests" of all Creditors and Interest Holders, (vi) the Plan is feasible, and (vii) the Plan has been accepted by the requisite number and amount of Creditors or Interest Holders in each Class entitled to vote on the Plan, or that the Plan may be confirmed without such acceptances. The Debtors believe that all of these conditions have been or will be met prior to the Confirmation Hearing.

**Best Interest Test.** The so-called "best interest" test requires that each impaired Creditor and impaired Interest Holder either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such entity would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

To determine what the holders in each Impaired Class of Claims or Interest would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in a chapter 7 liquidation case. The amount that would be available for satisfaction of Allowed Claims against and Allowed Interests in the Debtors would consist of the proceeds resulting from the disposition of the Debtors' assets, augmented by the cash held by the Debtors at the commencement of the chapter 7 case. Such amount would be reduced by the amount of any Claim or Claims secured by the Debtors' assets, the costs and expenses of the liquidation, and such additional Administrative Claims and Priority Claims that may result from the termination of the Debtors' businesses. Such value is then juxtaposed against the amount creditors are receiving under the Plan to determine if the value each impaired creditor is receiving is the same or more than such creditor would receive from a chapter 7 liquidation on the Confirmation Date.

The costs of liquidation under chapter 7 would become Administrative Claims with the highest priority against the proceeds of liquidation. Such costs would include the fees payable to a chapter 7 trustee, as well as those which might be payable to attorneys, financial advisors, appraisers, accountants and other professionals that such Debtors may engage to assist in the liquidation. In addition, chapter 7 costs would include any liabilities incurred or assumed pursuant to the transactions necessary to effectuate the liquidation. Moreover, claims entitled to administrative priority may arise by reason of any breach or rejection of any executory contracts entered into by the Debtors during the pendency of the Case in chapter 11.

After satisfying Administrative Claims arising in the course of the chapter 7 liquidation, the proceeds of the liquidation would then be payable to satisfy any unpaid expenses incurred during the time these Case were pending under chapter 11, including compensation for attorneys, financial advisors, appraisers, accountants and other professionals retained by the Debtors or any official committee appointed pursuant to section 1102 of the Bankruptcy Code. A liquidation analysis, annexed hereto as Exhibit "D" contains the Debtors' best estimate of the results of such a "hypothetical" liquidation on the Effective Date of the Plan.

After consideration of the effects that a chapter 7 liquidation would have on the proceeds available for distribution including (i) the increased costs and expenses of a chapter 7 liquidation arising from fees payable to the Debtors in bankruptcy and professional advisors to such Debtors, (ii) the erosion in value of the Debtors' assets in a chapter 7 case in the context of the

expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, in particular for a property which requires significant investment and time to reach its full potential, (iii) the potential increases in Claims which would be satisfied on a priority basis or on a parity with the Claims of General Unsecured Creditors, (iv) the fact that the Plan calls for full payment with interest of all Unsecured Claims and (v) the significant uncertainties arising from continued litigation with the City of New York regarding its claim against the estate, the Debtors believe that holders of Claims and Interests would be unlikely to receive any greater distribution on account of their Claims and Interests than they would under the Plan. Indeed, based upon the City's asserted claim of approximately $64,000,000, no distribution would be available to unsecured creditors in this case.

**Liquidation Analysis.** The Debtors have concluded that the Plan provides to each Creditor and Interest Holder a recovery with a *present value* at least equal to the present value of the distribution that such person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Plan generally provides for the liquidation of the Debtors' assets and the distribution of the proceeds thereof in accordance with the Priorities set forth in the Bankruptcy Code. Creditors would be entitled to no better treatment in a liquidation case under chapter 7 of the Bankruptcy Code. The Debtors further believe that the net effect of a conversion of this case to chapter 7 would be to (i) increase the administrative expenses of the estate (ii) an increase (perhaps substantial) in the real estate tax claim held by the City of New York and (iii) decrease the funds available for non-administrative creditors. Accordingly, the Debtors believe that the Plan provides Creditors with at least as much as they would be entitled to receive in a chapter 7 liquidation.

**Feasibility.** For the Plan to be confirmed, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation is set forth in the Plan. This Plan calls for the liquidation of the Debtors through a sale of all of its assets to Metrovest in exchange for the Plan Fund. The Plan Fund, the proponents believe, contains sufficient Cash to pay all secured and priority claims and Unsecured Claims subject to a $135,000 cap. Based upon the commitments obtained by Metrovest, the proponents believe the Plan is feasible.

**Confirmation with the Acceptance of Each Impaired Class.** The Plan may be Confirmed if each impaired Class of Claims or Interests accepts the Plan. Classes of Claims or Interests that are not impaired are deemed to have accepted the Plan. A Class is impaired if the legal, equitable or contractual rights attaching to the Claims or Interests of that Class are modified other than by curing defaults and reinstating maturities or by payment in full in cash.

Holders of Claims or Interests impaired by the Plan are entitled to file Ballots accepting or rejecting the Plan. Holders of Claims or Interests not impaired by the Plan, are deemed to accept the Plan, and may not vote to accept or reject the Plan. Holders of Claims or Interests that will neither receive nor retain any property under the Plan and are deemed to reject the Plan.

The Bankruptcy Code defines acceptance of a plan by a Class of Claims as acceptance by the holders of two-thirds in dollar amount and a majority in number of Claims of that Class. Only those Claims, the holders of which actually vote to accept or reject the Plan, are counted for the purpose of determining whether the requisite number and amount of acceptances have been received.

**Confirmation without the Acceptance of Each Impaired Class**. In the event that any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtors' request if (i) all other requirements of section 1129(a) of the Bankruptcy Code are satisfied, (ii) at least one impaired Class of Claims votes to accept the Plan without regard to any vote cast on account of a Claim held by "insiders" (as defined in the Bankruptcy Code) and (iii) as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Class. The Debtors believe that the Plan is in the best interest of all Creditors and Interest holders and strongly recommends that all parties entitled to vote cast their ballots in favor of accepting the Plan. Nevertheless, out of an excess of caution, pursuant to the Plan, the Debtors have requested that the Court confirm the Plan over the rejection of any non-accepting class in the event all other elements of section 1129(a) are satisfied.

A plan "does not discriminate unfairly" if the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are intertwined with those of the non-accepting class, and no class receives payments in excess of that which it is legally entitled to receive for its Claims or Interests. The Debtors believe that under the Plan all classes of Impaired Claims and Impaired Interests are treated in a manner that is consistent with the treatment of other classes of Claims and Interests with which their legal rights are intertwined, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims and Allowed Interests in such class. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

Whether the Plan is fair and equitable depends upon the application of the so-called "absolute priority rule." Subject to certain exceptions, this rule, codified in section 1129(b)(2) of the Bankruptcy Code, generally requires that an impaired Class of Claims or Interests that has not accepted the Plan must be paid in full if a more junior class receives any distribution under the Plan.

With respect to Secured Claims, the absolute priority rule allows the confirmation of a Plan over the rejection of a class of Secured Claims if the holders of such Claims retain their liens and each holder of a Claim of such class receives on account of such Claim deferred cash payments, totaling at least the allowed amount of such Claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the property securing its Claim. All Secured Claims are

being paid in full in Cash on the Effective Date or as otherwise agreed by such claim holder and the plan proponents

With respect to Unsecured Claims, the absolute priority rule allows the confirmation of a Plan over the rejection of a class of Unsecured Claims if the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property. With respect to Unsecured Claims, no holder of a junior interest will receive or retain any interest in the Debtors under the Plan. Rather, Metrovest has agreed to allow certain electing Limited Partners who agree to contribute their *pro-rata* portion of the cash necessary to fund the Plan and make a personal guaranty of the bank debt necessary to raise the Plan Fund, to have a right to obtain an interest in the Successor Entity which is acquiring the Debtors' apartment buildings under the Plan. Since such interest of these electing limited partners is not in the Debtors, the availability of this one-time option does not violate section 1129(b) as it relates to Unsecured Creditors in this case.

## EFFECT OF CONFIRMATION

### RELEASES

**Section 1125(e) of the Bankruptcy Code, commonly referred to as the "safe harbor," protects persons acting in good faith, from civil claims arising in connection with solicitations of acceptances of plans of reorganization or participating in the offer, issuance, sale or purchase of a security under the Plan. Pursuant to section 1125(e), as set forth in Article 9 of the Plan, neither the Debtors, nor its respective officers, directors, members, general partner, managers or employees (acting in such capacity), nor any professional person employed by any of them, nor Metrovest or its agents, employees and professionals, shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Case or the Plan except for (i) willful misconduct and gross negligence and (ii) liability of any released person for any debt owed to the United States Government, any state, city or municipality arising under (a) the Internal Revenue Code or any state, city or municipal tax code, (b) the environmental laws of the United States or any state, city or municipality or (c) any criminal laws of the United States, any state, city or municipality. From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute, and may be submitted as, a complete defense to any claim or liability released pursuant to this Article 9 of the Plan.**

The Plan also contains releases by and between the Debtors, its Interest Holders and employees and Zukerman Bros., on the one hand, and the Debtors' Creditors, on the other, for acts or omissions based upon the Debtors' business affairs prior or subsequent to the commencement of the Case or any claims based on the negotiation, submission and confirmation of the Plan. The exact terms of the releases are set forth in article 9.3 of the Plan, to which interested parties are referred. The releases set forth in article 9.3 of the Plan are deemed to have been given in exchange for the consideration set forth under the Plan. The language in article 9.3 of the Plan is intended to provide finality with respect to the Debtors' pre-petition conduct of its business affairs and to implement the protections of section 1125(e) and 1141 of the Bankruptcy Code. The scope of the releases set forth in Article 9.3 are limited with respect to certain tax, criminal and environmental matters as set forth therein.

## INJUNCTION

Except (i) as otherwise provided in the Plan, (ii) as otherwise provided under Final Order entered by the Bankruptcy Court or (iii) with respect to the Debtors' obligations under the Plan, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin (i) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the property of the Estate that has been, or is to be, distributed under the Plan, and (ii) the creation, perfection or enforcement of any lien or encumbrance against any property of the Estate that has been, or is to be, distributed under the Plan.

Except as otherwise provided in the Confirmation Order, the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act, to collect, recover or offset, from the property of the Estate, any obligation or debt except pursuant to the terms of the Plan.

## LIMITATION OF LIABILITY

In addition to the releases set forth in section 9.3, the Plan contains certain limitations on liability with respect to actions taken in connection with the promulgation, confirmation and dissemination of the Plan as well as actions taken in connection with the Case. Such limitation is intended to require any person or entity which may desire to assert claims against the Debtors and certain other persons named in section 9.2 to assert such claims prior to confirmation of the Plan or be forever barred from raising such claims at a later date. This provision gives finality to parties involved in the Case with respect to any actions taken during the Case as well as actions taken in connection with the Plan. Persons or entities who

**fail to raise such claims prior to confirmation of the Plan shall be deemed to have waived such claims and be forever barred from raising such claims as set forth in the Plan**.

## ALTERNATIVES TO THE PLAN

If the Plan is not confirmed by the Bankruptcy Court the alternatives may include (a) liquidation of the Debtors under chapter 7 of the Bankruptcy Code or (b) the promulgation and confirmation of an alternative plan of reorganization.

The Debtors believe that the Plan provides a recovery to all Creditors and Interest Holders equal to or greater than would be obtainable in chapter 7 liquidation. See Liquidation Analysis. The Debtors have considered various alternative reorganization proposals, including an immediate sale of the property.

If the Plan is not confirmed, the Debtors could attempt to formulate a different plan of reorganization. Such a plan might involve both a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets or an agreement with another plan funders like Metrovest. With respect to an alternative plan, prior to the execution of the Plan Funding Agreement, the Debtors have explored various other alternatives in connection with the process of formulating and developing the Plan. The Debtors believe that the Plan enables Creditors and Interest Holders to realize the most value under the circumstances at the present time.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The Debtors have not researched the tax consequences of the Plan to holders of Claims and Interests. The Debtors have not requested any ruling from the Internal Revenue Service or any other taxing authority with respect to such matters. Matters not discussed in this Disclosure Statement may affect the tax consequences of the Plan on any particular holder of a Claim or Equity Interest. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS.

## ADDITIONAL INFORMATION

Requests for information and additional copies of this Disclosure Statement, the Ballots and the other materials delivered together herewith and all deliveries, correspondence and questions, as the case may be, relating to the Plan should be directed to (i) the Debtors' counsel, Robinson Brog Leinwand Greene Genovese & Gluck P.C., 1345 Avenue of the Americas, New York, New York 10105-0143, Attn.: Fred B. Ringel, Esq., (212) 586-4050 or (ii) may be retrieved from the

Court's web site at https://ecf.nysb.uscourts.gov/cgi-bin/login.pl (provided such party has PACER access) by searching case no 00-10361.

        Copies of all pleadings, orders, lists, schedules, proofs of claims or other documents submitted in these cases are on file in the Office of the Clerk of the United States Bankruptcy Court at Alexander Hamilton Custom House, One Bowling Green, Fifth Floor, New York, New York 10004, and are available for public inspection Monday through Friday, between the hours of 9:00 a.m. and 5:00 p.m.

## CONCLUSION

The Debtors and Metrovest believe that the Plan is in the best interests of all Creditors and Interest Holders and strongly encourages all holders of Claims against and Interests in the Debtors to vote to accept the Plan and to evidence such acceptance by promptly returning their Ballots to ensure that they will be received not later than 5:00 p.m., Eastern Standard Time, on. _____, 2001.

Dated:  New York, New York
         October 24, 2001

DAYTON SEASIDE ASSOCIATES #2, L.P.
DAYTON SEASIDE ASSOCIATES #3, L.P.
DAYTON OPERATING CO., L.P.


By: /s/ Martin Zukerman
     Name: Martin Zukerman
     Title: President of the respective
          General Partners of the Debtors


METROVEST CAPITAL CORP.


By: /s/ George Filopoulos
     Name: George Filopoulos
     Title: President